**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Antonio LOPEZ, Defendant-Appellant.**

**No. 72-1544.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 14, 1973.

Decided March 26, 1973.

Rehearing Denied April 11, 1973.

Ronald Lev, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., William T. Huyck, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, Chief Judge, HASTINGS, Senior Circuit Judge, and KILEY, Circuit Judge.

HASTINGS, Senior Circuit Judge.

Defendant Antonio Lopez was charged in a two-count indictment with violations of Title 21, U.S.C.A. § 174. A conspiracy was charged in Count One and a substantive violation in Count Two. In essence, the subject of both counts was the offense of fraudulently and knowingly receiving, concealing, buying, selling and facilitating the transportation, concealment and sale of approximately 474 grams of a mixture containing heroin, and conspiring to do so. The conspiracy count named as defendant's co-conspirators defendants Pablo Troche, Robert Warren and Antonio Gobel. The substantive count named the same three persons as defendants with Lopez.

Defendant Lopez was tried with Troche, and a jury found each of them guilty on both counts. Gobel was dismissed from the case. Warren was a fugitive from justice at the time of the trial. Lopez and Troche were each sentenced by the trial court to serve a total term of five years in a federal penitentiary. Defendant Lopez alone has appealed.

A brief statement of the facts, considered in the light most favorable to the Government, will furnish the setting necessary to consider the issues raised on appeal. Agents of the Federal Bureau of Narcotics and Dangerous Drugs conducted an investigation leading to the arrest of defendant; Agent Vinsik supervised.

The agents had heard that Robert Warren was in Chicago to sell narcotics. Warren and Antonio Gobel were both residing in Room 1207 at the Holiday Inn, 644 North Lake Shore Drive, Chicago, Illinois, on June 20, 1969. Agent Vinsik, with other agents, heard voices coming out of 1207. The next day Agent Vinsik rented Room 1209, which was to the north of, adjacent to and shared a common wall with 1207. The agents commenced a 24-hour surveillance of the defendants. Both Warren and Gobel were known to have dealt in narcotics.

The agents testified that while in 1209 they could hear conversations and other

recognizable voices in 1207 through the common wall, using only the naked ear. The agents were able to tell whether someone was going in and out of 1207 by the sound of the door and the rush of air from the door. No electronic devices were use by the agents.

On June 22, 1969, at about 2:30 P.M., Agent Vinsik heard the telephone ring in 1207 and Warren's voice answer, "Hello," "It will be here either tonight or tomorrow morning," followed by, "Paul sent the 150; the other guy sent the 100, 150. We have the 100, all we have to do is sit and wait for the stuff now." Later that evening, someone knocked on the door of 1207 and identified himself as "It's Buddy," from Indiana, and asked, "Do you have anything yet?" Warren responded, "No, not yet."

At 10:30 A.M., June 23, 1969, defendant Lopez was first seen leaving a Flash cab in front of the Holiday Inn, where he was met by Warren. Lopez was staying in Room 1220, down the hall from 1207. Room 1220 was obtained by Warren, registered in the name of A. Vitali and paid for by Lopez. Later that day, Lopez and Warren were seen together in the lobby of the Holiday Inn. About 12:40 P.M. Agent Vinsik heard the telephone ring in 1207 and Warren's voice say, "American Airlines Flight 249 arriving at 10:00 o'clock Chicago time, A. Vitali," and, after a pause, "I'll pick you up." About 1:00 P.M., there was a knock on the door of 1207, and Warren's voice asked, "Who is it?" The answer was, "It's me, the devil." Warren then said he didn't have anything yet, but it would cost a thousand dollars an ounce and it would be good stuff. Later, at about 8:30 P.M., Warren was observed going to the American Airlines terminal, O'Hare International Airport. He asked about Flight 249 and was informed it had been cancelled.

During the next day, June 24, 1969, Agent Cruz, who speaks Spanish, overheard Lopez and Gobel discuss how much money they were going to make. Agents heard numerous telephone calls and people going and coming from 1207 during the evening hours. About 6:30 P.M., Troche was seen leaving a cab, carrying a black attache case, getting a room assignment and then going up to 1207. After Troche entered the room Warren asked, "Where is it?" Troche answered. "Here it is." Warren stated, "The stuff looks good. Let's weigh it and get out of here. We will hold the customers downstairs and I'll tell them the price." Agents heard a set of scales banging up and down. Later, Lopez was heard to say, "Let's get going. Let's get out of here."

Agent Vinsik then stood by the door of 1209 and waited for the door to 1207 to open. When Lopez opened the door of 1207 about ten agents, led by Vinsik, immediately entered the room and without delay arrested Lopez, Warren and Gobel. The arrest occurred about 7:45 P.M. on June 24, 1969. The agents did not use a passkey but, after hearing that Lopez was ready to leave, waited outside in the hallway for someone inside Room 1207 to open the door.

On a desk located adjacent to the common wall in 1207 were several bags of a white powder, a scale, some strainers and a can of dextrose anhydrous Merck. There was testimony that dextrose anhydrous Merck is frequently used to cut and mix a stronger quality of heroin to a lesser quality for use. It was shown that the 474 grams of heroin seized from the desk in 1207 were 100 per cent pure heroin.

Agent Vinsik testified that "[a]s soon as the door was opened, I went right in" and that Lopez "never got outside the room." The agents had neither an arrest warrant nor a search warrant. Prior to their entry they made no announcement of their identity or purpose. As soon as they entered the room, they arrested and handcuffed Lopez and gave him *Miranda* [1] warnings, as they also did to Warren and Gobel.

At a pre-trial hearing on February 29, 1972, a motion to suppress the evidence

---

1. *Miranda v. Arizona*, 384 U.S. 436, 36 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

seized in Room 1207 was denied,[2] as was a motion requesting the trial judge to inspect the scene of the arrest. A motion to have the jury view Rooms 1207 and 1209 was made during trial and denied.

I

Citing Title 18, U.S.C.A. § 3109,[3] defendant first argues that the trial court erred in admitting into evidence the 474 grams of pure heroin because the arresting officers failed to announce their authority and purpose before entering Room 1207. No claim is made that the agents needed either a search warrant or an arrest warrant. It is conceded that § 3109 applies where an entry is made to effect an arrest without a warrant. Sabbath v. United States, 391 U.S. 585, 588–589, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968); Miller v. United States, 357 U.S. 301, 306, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958).

Relying upon Sabbath and Miller, defendant argues that § 3109 requires that prior to entering a dwelling, officers must make (1) an announcement of their authority to make the arrest, and (2) an announcement of their purpose to make an arrest, and that failure to do so vitiates an otherwise valid arrest and search and seizure incidental to such an arrest. Defendant reads the evidence at the pre-trial suppression hearing as showing that the agents failed to comply with the requirements of § 3109. We do not agree.

In the first place, we find Sabbath and Miller distinguishable on their facts from the case at bar. In Sabbath, federal officers *opened a closed but unlocked door* without announcing their authority or purpose. In *Miller, the door was locked with a door chain, and the arresting officers put their hands inside the door, ripped the chain off* and then entered without demanding admission or stating

the purpose of their presence or placing the occupant under arrest until after they had entered his apartment.

Mr. Justice Brennan, speaking for the majority in Miller, analogized the requirements of § 3109 with the requirements of local District of Columbia law and found them substantially identical. 357 U.S. at 306, 78 S.Ct. 1190. The majority finally stated: "Every householder, the good and the bad, the guilty and the innocent, is entitled to the protection designed to secure the common interest against unlawful invasion of the house. The petitioner could not be lawfully arrested in his home *by officers breaking in* without first giving him notice of their authority and purpose. Because the petitioner did not receive that notice *before the officers broke the door to invade his home,* the arrest was unlawful, and the evidence seized should have been suppressed." (Emphasis added.) *Id.* at 313–314, 78 S.Ct. at 1198.

In *Sabbath,* Mr. Justice Marshall took note of the various means of entry found violative of § 3109, and said: "And it has been held that § 3109 applies to entries effected by the use of a passkey, which requires no more force than does the turning of a doorknob. An unannounced intrusion into a dwelling—what § 3109 basically proscribes—is no less an unannounced intrusion whether officers break down a door, force open a chain lock on a partially open door, open a locked door by use of a passkey, *or as here, open a closed but unlocked door.* The protection afforded by, and the values inherent in, § 3109 must be 'governed by something more than the fortuitous circumstance of an unlocked door.'" (Citations and footnotes omitted; emphasis added.) 391 U.S. at 590, 88 S.Ct. at 1758. Further, in reference to whether "exigent circumstances" mentioned in

---

2. After leaving 1207 certain agents went to Room 3105, where Troche was the registered occupant. Without warning and *by use of the pass key, they entered the room,* arrested Troche and seized a *packet of heroin.* This evidence was ordered suppressed on March 1, 1972, following the pre-trial hearing the previous day.

3. "The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."

*Miller* might excuse compliance with § 3109, the Court noted that the agents did not "make any independent investigation of petitioner prior to setting the stage for his arrest with the narcotics in his possession." *Id.* at 591, 88 S.Ct. at 1759.

█ In the case now before us we find that none of the situations outlined in either *Miller* or *Sabbath* exist here. The agents had kept a constant surveillance of the premises and the four defendants for several days. There was probable cause to believe that heroin was unlawfully brought into Room 1207, that defendant Lopez was a party to the crime and was about to leave the room. Lopez voluntarily opened the door in the act of leaving the room. As Agent Vinsik testified on cross-examination: "* * * We had planned and heard conversations which told us the narcotics were in the room at that time. We could hear them talking, Mr. Lopez was going to leave the room, and we could then go in and make the arrest at the time he opened the door." This is exactly what the agents did.

Under the facts of this case, we have found no authority, and none has been cited, which would justify our finding that the agents were required to comply with the provisions of § 3109.

Defendant cites United States v. Likas, 7 Cir., 448 F.2d 607 (1971), where the agents entered defendant's apartment to execute a search warrant without first announcing their authority and purpose. That case should afford defendant cold comfort here. In *Likas*, the agents first broke down the apartment door with a sledge hammer and, of course, we upheld the suppression of the seized evidence.

We have considered other cases cited by defendant but are not persuaded that they either justify or dictate a result contrary to the one we have reached on this issue. *Cf.* United States v. Vargas, 9 Cir., 436 F.2d 1280 (1971).

We hold that the trial court did not err in admitting into evidence the 474 grams of heroin seized incidental to a lawful arrest of defendant.

II

Defendant charges that the trial court abused its discretion in refusing his counsel's request to view the scene of the arrest at the time of the pre-trial suppression hearing on February 29, 1972, and in denying defendant's motion to have the jury view the scene during the trial the next week. We find no merit in these contentions.

The commission of the charged offenses occurred on June 24, 1969, or about two years and eight months before the requests were made. At no time did defendant offer any proof to sustain his motion, other than his counsel's statements. Many variables enter into such a "view," including the surrounding physical condition of the premises and the many personal factors involving the several persons concerned.

█ It is well established that the granting or denying of such a motion rests within the discretion of the trial court and is reviewable only for abuse. In United States v. Pinna, 7 Cir., 229 F.2d 216, 219 (1956), we said: "It seems to us that too many uncertain factors were involved to have made such view or inspection of any value." This was reaffirmed in Hughes v. United States, 9 Cir., 377 F.2d 515, 516 (1967).

█ We hold that the trial court did not abuse its discretion in denying defendant's motion to view the scene of the arrest.

III

█ Finally, defendant suggests that, in any event, this case should be remanded to the district court so that he may be afforded a hearing to determine whether this is an appropriate case for the sentence to be suspended and defendant to be placed on probation.

Defendant was tried during the first few days of March 1972. He was sentenced on March 7, 1972, to serve five years in a federal penitentiary pursuant to 21 U.S.C.A. § 174. The conspiracy and substantive counts charged violations on or about June 24, 1969. At

542

that time he was subject to a mandatory minimum sentence of five years, which could not be suspended, nor could probation be granted. These provisions were repealed by the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. 91–513, 84 Stat. 1236, 21 U.S.C.A. § 801 *et seq.*, effective May 1, 1971.

Defendant relies upon United States v. Robinson, 7 Cir., 466 F.2d 780 (1972), and United States v. McGarr, 7 Cir., 461 F.2d 1 (1972). Insofar as these two cases relate to suspension of sentence and probation, they were in effect overruled by the recent decision of the Supreme Court in Bradley v. United States, 410 U.S. 605, 93 S.Ct. 1151, 35 L.Ed.2d 528 (1973). In *Bradley,* the Court held: "The District Judge had no power to consider suspending petitioners' sentences or placing them on probation." *Id.*, 93 S.Ct. at 1155. In view of *Bradley,* there is no occasion to remand this matter to the district court for reconsideration.

Consistent with this opinion, the judgment of the district court is in all respects affirmed.

Affirmed.