STATE OF NEBRASKA, APPELLEE, V.
MICHAEL J. RAMIREZ, APPELLANT.

745 N.W.2d 214

Filed January 25, 2008. No. S-06-920.

James R. Mowbray and Robert W. Kortus, of Nebraska Commission on Public Advocacy, for appellant.

Jon Bruning, Attorney General, and George R. Love for appellee.

HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

## I. NATURE OF CASE

Michael J. Ramirez was convicted by the district court in 2004 with use of a firearm to commit a felony,[1] being a felon in possession of a firearm,[2] and terroristic threats.[3] Ramirez was also found to be a habitual criminal.[4] Ramirez was acquitted by a jury of a count of possession of methamphetamine. Ramirez was sentenced, collectively, to terms of imprisonment totaling not less than 25 nor more than 50 years. His trial counsel also served as counsel on direct appeal, and the only issue raised in his brief was whether his sentences were excessive. The Nebraska Court of Appeals summarily affirmed.[5]

Ramirez filed a motion for postconviction relief in the district court on November 23, 2005, alleging ineffective assistance of counsel in several respects. The court, after an evidentiary hearing, denied Ramirez' motion, and he appeals. The evidence pertinent to the issues Ramirez raises on appeal will be set forth below, in conjunction with our analysis of each issue.

## II. ASSIGNMENTS OF ERROR

Ramirez assigns, consolidated and restated, that the district court erred in failing to conclude that

---

[1] See Neb. Rev. Stat. § 28-1205 (Reissue 1995).

[2] See Neb. Rev. Stat. § 28-1206 (Reissue 1995).

[3] See Neb. Rev. Stat. § 28-311.01(1)(a) (Reissue 1995).

[4] See Neb. Rev. Stat. § 29-2221 (Reissue 1995).

[5] See *State v. Ramirez*, 13 Neb. App. xxxix (No. A-04-1398, May 5, 2005).

(1) his rights to double jeopardy and due process were violated when the same felony conviction was used as a predicate for (a) being a felon in possession of a firearm and (b) the habitual criminal enhancement of his sentence for being a felon in possession of a firearm;

(2) he was deprived of effective assistance of counsel when counsel failed to adequately seek the suppression of evidence obtained from the search of his residence; and

(3) he was deprived of effective assistance of counsel when his counsel failed to (a) object to inadmissible evidence, (b) introduce favorable evidence, and (c) impeach witnesses at trial with inconsistent evidence from the affidavit used to obtain the search warrant.

## III. STANDARD OF REVIEW

■ Appellate review of a claim of ineffective assistance of counsel is a mixed question of law and fact. When reviewing a claim of ineffective assistance of counsel, an appellate court reviews the factual findings of the lower court for clear error. With regard to the questions of counsel's performance or prejudice to the defendant as part of the two-pronged test articulated in *Strickland v. Washington*,[6] an appellate court reviews such legal determinations independently of the lower court's decision.[7]

## IV. ANALYSIS

■ Ramirez' arguments are each framed by whether he was denied effective assistance of counsel at trial. In order to establish a right to postconviction relief based on a claim of ineffective assistance of counsel at trial or on direct appeal, the defendant has the burden, in accordance with *Strickland*,[8] to first show that counsel's performance was deficient; that is, counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law in the area. Next, the defendant

---

[6] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[7] *State v. Sims*, 272 Neb. 811, 725 N.W.2d 175 (2006).

[8] *Strickland, supra* note 6.

must show that counsel's deficient performance prejudiced the defense in his or her case. In order to show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. The two prongs of this test, deficient performance and prejudice, may be addressed in either order.[9]

■ Before addressing the specific arguments Ramirez makes on appeal, we note that the issues raised are not procedurally barred. Although a motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal,[10] when a defendant was represented both at trial and on direct appeal by the same lawyer, the defendant's first opportunity to assert ineffective assistance of trial counsel is in a motion for postconviction relief.[11]

### 1. DOUBLE JEOPARDY

Ramirez argues that his rights under the Double Jeopardy Clause were violated when the same felony conviction was used to prove his status as a felon for the charge of being a felon in possession of a firearm, then prove he was a habitual criminal for the purpose of enhancing his sentence on that charge. Ramirez claims that his right to effective assistance of counsel was violated because trial counsel did not object to the sentencing enhancement on double jeopardy grounds. The postconviction court rejected this argument, concluding that Ramirez was not prejudiced by counsel's failure to object because the Double Jeopardy Clause does not preclude the use of the same felony to establish felon status and then enhance a sentence.

### (a) Background

The information charging Ramirez with being a habitual criminal alleged three predicates: (1) a 1991 conviction for possession of marijuana with intent to deliver, (2) a 1999 conviction for theft, and (3) a 2000 conviction for manufacturing or distributing marijuana. But at sentencing, the State only

---

[9] *Sims, supra* note 7.

[10] *State v. Marshall*, 269 Neb. 56, 690 N.W.2d 593 (2005).

[11] *State v. McHenry*, 268 Neb. 219, 682 N.W.2d 212 (2004).

presented evidence of the 1991 and 2000 convictions to support sentencing as a habitual criminal. And, as previously noted, Ramirez was convicted pursuant to jury verdict of being a felon in possession of a firearm. The only evidence adduced at trial to establish Ramirez' status as a felon was evidence of the 2000 marijuana conviction. The habitual criminal finding was used to enhance Ramirez' sentence for being a felon in possession of a firearm.

Trial counsel testified in his deposition, on postconviction, that he "briefly" considered the double jeopardy implications of the charges, but did not pursue the issue "[w]hen [he] noticed there were three prior felonies as opposed to two." Counsel later admitted that he did not specifically consider the double jeopardy implications of using the same felony conviction for the offense of felon in possession and then for the habitual criminal enhancement.

(b) Analysis

The Double Jeopardy Clauses of both the federal Constitution and the Nebraska Constitution protect against three distinct abuses: (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense.[12] Ramirez' argument here seems to be that he is being subjected to multiple punishments for the same offense, although his argument also implicates statutory interpretation. However, in this context, the two inquiries are related. As the U.S. Supreme Court has explained with respect to the prohibition on multiple punishments, "the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended."[13] The question of what punishments are constitutionally permissible is no different from the question of what punishment the legislative

---

[12] *State v. Mata*, 266 Neb. 668, 668 N.W.2d 448 (2003).

[13] *Missouri v. Hunter*, 459 U.S. 359, 366, 103 S. Ct. 673, 74 L. Ed. 2d 535 (1983).

branch intended to be imposed.[14] Where the Legislature intends to impose multiple punishments, "imposition of such sentences does not violate the Constitution."[15] With those principles in mind, we turn to the statutes at issue in this case.

Section 28-1206(1) provides that "[a]ny person who possesses any firearm . . . and who has previously been convicted of a felony . . . commits the offense of possession of a deadly weapon by a felon . . . ." Possession of a firearm by a felon is a Class III felony.[16] And § 29-2221(1) provides, subject to certain exceptions not relevant here, that

> [w]hoever has been twice convicted of a crime, sentenced, and committed to prison ; . . . for terms of not less than one year each shall, upon conviction of a felony committed in this state, be deemed to be a habitual criminal and shall be punished by imprisonment . . . for a mandatory minimum term of ten years and a maximum term of not more than sixty years . . . .

It is clear that standing alone, neither § 28-1206 nor § 29-2221 implicates double jeopardy.[17] Ramirez does not contend otherwise. Instead, he relies on our decisions in *State v. Chapman*[18] and *State v. Hittle*,[19] which he claims are applicable.

In *Chapman*, the defendant was charged with third-offense driving under the influence of alcoholic liquor (DUI) and being a habitual criminal. Evidence was received of three prior convictions for DUI, and the trial court found that the offense with which the defendant was charged was a third offense. The defendant had previously been convicted of two felonies: third-offense DUI and malicious destruction of property. Based

---

[14] *Albernaz v. United States*, 450 U.S. 333, 101 S. Ct. 1137, 67 L. Ed. 2d 275 (1981). Accord *Hunter, supra* note 13.

[15] *Albernaz, supra* note 14, 450 U.S. at 344.

[16] § 28-1206(3)(b).

[17] See, *State v. Peters*, 261 Neb. 416, 622 N.W.2d 918 (2001); *Addison v. Parratt*, 208 Neb. 459, 303 N.W.2d 785 (1981). See, also, *Witte v. United States*, 515 U.S. 389, 115 S. Ct. 2199, 132 L. Ed. 2d 351 (1995).

[18] *State v. Chapman*, 205 Neb. 368, 287 N.W.2d 697 (1980).

[19] *State v. Hittle*, 257 Neb. 344, 598 N.W.2d 20 (1999).

upon those two felonies, the court sentenced the defendant as a habitual criminal under § 29-2221.[20]

On appeal, we rejected the defendant's constitutional claims.[21] But we concluded that the trial court had erred in its interpretation of the relevant statutes. We explained:

> For the first time, this court faces the question of whether a previous conviction of an offense made a felony solely by reason of a previous conviction may be utilized as a basis for an adjudication of habitual criminality under the habitual criminal statute. We hold that offenses which are · felonies because the defendant has been previously convicted of the same crime do not constitute "felonies" within the meaning of prior felonies that enhance penalties under the habitual criminal statute.
>
> The weight of authority is against double penalty enhancement through application of both a specific subsequent offense statute and a habitual criminal statute. . . . [T]hese decisions do not rest on federal constitutional grounds. The `issue of whether, upon conviction of a misdemeanor, sentence could be imposed on a felony charge under a habitual criminal statute rests on an interpretation of state law.[22]

We noted that "[s]everal states have held that penalty enhancement provisions set forth for subsequent offenses of specific crimes must be used when applicable instead of sentencing under a habitual criminal act, implying that both statutes may not be used for double penalty enhancement in sentencing for one offense."[23] Adopting that reasoning, we concluded that a felony based on a multiple-offense DUI was exempt from the operation of § 29-2221.

In *Hittle*,[24] the defendant was convicted of felony flight to avoid arrest and felony driving under a 15-year license

---

[20] See *Chapman, supra* note 18.

[21] See *id.*

[22] *Id.* at 370, 287 N.W.2d at 698-99 (citations omitted).

[23] *Id.* at 371, 287 N.W.2d at 699 (emphasis omitted).

[24] *Hittle, supra* note 19.

suspension. The trial court found the defendant to be a habitual criminal, based on two predicate terms of imprisonment, one of which was for second-offense driving on a suspended license.

■ On appeal, we acknowledged that *Chapman* was distinguishable, because even first-offense driving under a 15-year license suspension is a Class III felony.[25] But we explained *Chapman* as resting upon two general principles:

> (1) A defendant should not be subjected to double penalty enhancement through application of both a specific subsequent offense statute and a habitual criminal statute and (2) the specific enhancement mechanism contained in Nebraska's DUI statutes precludes application of the general enhancement provisions set forth in the habitual criminal statute.[26]

We further explained that "[o]ne can become a felon for driving under a suspended license only by having first committed multiple DUI offenses, at least some of which are misdemeanors, for which the license suspension was imposed."[27] Thus, we observed, "in a real sense, the penalty for this particular act has been enhanced by virtue of the defendant's prior violations of other provisions within the same statute."[28] Based on that reasoning, we concluded that a felony conviction for driving under a suspended license in violation of the DUI statutes could not be used to enhance a sentence under the habitual criminal statute.

■ Ramirez argues that *Chapman* and *Hittle* are applicable here. But while some courts have extended "double enhancement" reasoning to situations involving enhancement of a sentence for being a felon in possession of a weapon,[29] the weight

---

[25] See *id.*

[26] *Id.* at 355, 598 N.W.2d at 29.

[27] *Id.* at 356, 598 N.W.2d at 29.

[28] *Id.*

[29] See, e.g., *State v. Baker*, 970 So. 2d 948 (La. 2007); *Jackson v. Com.*, 650 S.W.2d 250 (Ky. 1983); *State v. Ware*, 201 Kan. 563, 442 P.2d 9 (1968); *State v. Haddenham*, 110 N.M. 149, 793 P.2d 279 (N.M. App. 1990); *Ramirez v. State*, 527 S.W.2d 542 (Tex. Crim. App. 1975); *State v. Smith*, 12 Ariz. App. 272, 469 P.2d 838 (1970).

of recent authority has established the rule that the use of a prior conviction to establish status as a felon and then enhance a sentence does not constitute impermissible double enhancement.[30] We find those decisions to be more persuasive and consistent with Nebraska law.

First, *Chapman* and *Hittle* both rest on the Legislature's specific intention in enacting the repeat offender enhancements of the DUI statutes, which are obviously not at issue here. And many courts that have rejected the use of a conviction to both establish status and enhance a sentence have done so, like this court in *Hittle* and *Chapman*,[31] because the status offense contained a specific penalty provision that would have been effectively nullified by the additional enhancement.[32] But that reasoning has been rejected when considering statutes that, like § 28-1206, do not expressly include their own sentencing provisions.[33] Other courts that have rejected the use of a conviction to both establish status and enhance a sentence have relied on the implicit statutory conflict that arose when, under their enhancement provisions, a single predicate conviction was sufficient to enhance the sentence for a second conviction.[34] But again, that reasoning is not applicable here, because under Nebraska law, a predicate conviction does not automatically prove the entire basis for enhancement of a sentence.[35]

---

[30] See, e.g., *U.S. v. Bates*, 77 F.3d 1101 (8th Cir. 1996); *U.S. v. Wallace*, 889 F.2d 580 (5th Cir. 1989); *People v. Baird*, 12 Cal. 4th 126, 906 P.2d 1220, 48 Cal. Rptr. 2d 65 (1995); *Gholston v. State*, 620 So. 2d 719 (Ala. 1993); *Woodson v. State*, 302 Ark. 10, 786 S.W.2d 120 (1990); *Woods v. State*, 471 N.E.2d 691 (Ind. 1984); *People v. Bergstrom*, 190 Colo. 105, 544 P.2d 396 (1975); *Bailleaux v. Gladden*, 230 Or. 606, 370 P.2d 722 (1962); *State v. Crump*, 178 N.C. App. 717, 632 S.E.2d 233 (2006); *People v. Phillips*, 219 Mich. App. 159, 555 N.W.2d 742 (1996); *Fry v. State*, 655 P.2d 789 (Alaska App. 1983). Cf. *State v. Wardell*, 329 Mont. 9, 122 P.3d 443 (2005).

[31] *Hittle, supra* note 19; *Chapman, supra* note 18.

[32] See, e.g., *Baker, supra* note 29; *Ware, supra* note 29; *Smith, supra* note 29.

[33] See, *Bergstrom, supra* note 30; *Fry, supra* note 30.

[34] See, e.g., *Jackson, supra* note 29; *Ware, supra* note 29; *Smith, supra* note 29.

[35] See § 29-2221. See, also, *Bergstrom, supra* note 30, citing *Hollander v. Warden*, 86 Nev. 369, 468 P.2d 990 (1970); *Fry, supra* note 30.

Nor, under Nebraska law, are the predicates for §§ 28-1206 and 29-2221 necessarily coextensive. The predicate for violating § 28-1206 is a felony conviction, which may or may not result in the term of imprisonment of "not less than one year" necessary to establish a predicate for sentence enhancement under § 29-2221.[36] The fact that the predicates for §§ 28-1206 and 29-2221 are defined in different terms suggests that the same conviction can be used for both status and enhancement if that conviction meets the independent requirements of each statute.[37] Stated another way, the element of § 28-1206 to be proved is the fact of a prior felony conviction, while the element of § 29-2221 to be proved is a prior conviction resulting in a term of imprisonment of no less than 1 year. "The distinction between a prior felony conviction and a separate prison term served for such felony is obvious," and there is no statutory conflict or double enhancement where, as here, a fact (i.e., the service of a prior prison term) that is not integral or indispensable to an element of possession of a firearm by a felon (i.e., a prior felony conviction) is used to enhance the sentence.[38]

Most importantly, this case simply does not involve double penalty enhancement. There is a significant distinction between double enhancement, which involves the "stacking" of multiple enhancement provisions that this court rejected in *Chapman*,[39] and the use of a conviction to establish status and then enhance a sentence.[40] And under Nebraska law, possession of a firearm by a felon is simply a Class III felony,[41] with no indication that it should be treated differently from any other Class III felony for purposes of sentence enhancement. The habitual criminal statute is, admittedly, a sentence enhancement—a stiffened penalty for the latest crime which is considered to be an

---

[36] See Neb. Rev. Stat. § 28-105(1) (Cum. Supp. 2006).

[37] See, *Baird, supra* note 30; *Gholston, supra* note 30.

[38] See *Baird, supra* note 30, 12 Cal. 4th at 132, 906 P.2d at 1224, 48 Cal. Rptr. 2d at 69. See, also, *Gholston, supra* note 30.

[39] *Chapman, supra* note 18.

[40] See, *Wallace, supra* note 30; *Wardell, supra* note 30; *Bailleaux, supra* note 30; *Crump, supra* note 30.

[41] § 28-1206(3)(b).

aggravated offense because it is a repetitive one.[42] Section 28-1206, however, is not a subsequent offense enhancement,[43] but a separate offense, enacted "'"'to lessen 'a high potential of danger to the public' and to reduce the 'probability that the convicted individual would continue his criminal activity.' . . .'"'"[44] Prohibiting a convicted felon from possessing a firearm neither punishes the felon for the underlying felony, nor enhances the sentence for another conviction—it is a new and separate crime of which the prior conviction is merely an element.[45]

As previously noted, the fundamental question in this double jeopardy analysis is one of legislative intent.[46] And it is apparent, from Nebraska's statutory scheme, that the Legislature intended for habitual criminals to be sentenced pursuant to § 29-2221, even when convicted of violating § 28-1206. The statutes define their necessary predicate elements using different standards. Possession of a firearm by a convicted felon is a Class III felony, with no statutory indication that it is meant to be treated differently from any other felony. In fact, § 28-105(3), which classifies felonies, specifically states that "[n]othing in this section shall limit the authority granted in sections 29-2221 and 29-2222 [(Reissue 1995)] to increase sentences for habitual criminals." And § 29-2221(1)(a) and (b) contain particular provisions for enhancing sentences for various crimes of violence, indicating that the Legislature has considered the implications of enhancing sentences for convictions under different statutes.

■ Stated another way, there is no ambiguity in either § 28-1206 or § 29-2221, and Ramirez' arguments do not provide us with a compelling basis for disregarding clear statutory mandates. The Double Jeopardy Clause does not impose "a constitutional rule requiring courts to negate clearly expressed

---

[42] *Addison, supra* note 17. Accord *Witte, supra* note 17.

[43] See *Hittle, supra* note 19.

[44] *Peters, supra* note 17, 261 Neb. at 423, 622 N.W.2d at 925.

[45] See *id.*

[46] See *Hunter, supra* note 13.

legislative intent."[47] Although the rule of lenity requires a court to resolve ambiguities in a penal code in the defendant's favor, the touchstone of the rule of lenity is statutory ambiguity, and where the legislative language is clear, "'we may not manufacture ambiguity in order to defeat that intent.' . . . Lenity thus serves only as an aid for resolving an ambiguity; it is not to be used to beget one."[48]

> Neither the habitual offender statute nor the felon in possession of a firearm statute prohibits the application of the statutory habitual offender sentence enhancement provision for a conviction of felon in possession of a firearm. Nor do these statutes expressly preclude a prior felony conviction that is used to establish the crime of felon in possession of a firearm from also being used as a prior conviction under the habitual offender statutes. . . . "Thus absent an absurd or unjust result, or one clearly inconsistent with the purposes and policies of the statutes involved, [this Court] would not be justified in concluding that the statutes' respective mutual use of a prior conviction" is prohibited.[49]

In short, where neither § 28-1206 nor § 29-2221 violates double jeopardy individually, there is no reason why they would offend the Double Jeopardy Clause when used in conjunction.[50] We reject Ramirez' claim that the Double Jeopardy Clause precluded the use of his 2000 marijuana conviction to establish his status as a felon for purposes of § 28-1206 and then enhance his sentence on that charge pursuant to § 29-2221. And because his sentence was lawful, he was not prejudiced by his trial counsel's failure to object on that basis. For those reasons, we find Ramirez' first assignment of error to be without merit.

---

[47] *Id.*, 459 U.S. at 368.

[48] *Albernaz, supra* note 14, 450 U.S. at 342.

[49] *Phillips, supra* note 30, 219 Mich. App. at 163, 555 N.W.2d at 744 (citation omitted). See, also, *Gholston, supra* note 30; *Woods, supra* note 30.

[50] See *Bates, supra* note 30.

## 2. Motion to Suppress Evidence

Ramirez contends that trial counsel should have moved to suppress evidence obtained from the execution of a search warrant, because an "any time" warrant was not justified, and the police did not "knock and announce" their presence when serving the warrant. The district court found that Ramirez had not been prejudiced because a motion to suppress would have been without merit.

### (a) Background

#### (i) Trial Evidence

The police investigation which led to the charges in this case began on June 10, 2004, when Melissa Bates called police and reported that she had been threatened at the home of Lucy Marlatt, where she was staying. Bates came in to the police department and made a report, along with Amber Troudt, Marlatt's daughter. Michael Cotant, an investigator with the Scotts Bluff County Sheriff's Department, interviewed Bates and Troudt and contacted the county attorney's office. Cotant secured a search warrant for Marlatt's residence, where Ramirez was also staying, and an arrest warrant for Ramirez.

In support of the application for the warrants, Cotant prepared two affidavits, in which he averred that Troudt and Bates had informed him they had seen Ramirez with drugs and drug paraphernalia. Cotant averred that Ramirez was a convicted felon and that Bates had seen Ramirez with a shotgun that he kept with him. Cotant also averred that Bates had reported that on June 2 or 3, 2004, Ramirez had pointed the shotgun at Bates and threatened to kill her.

The district court issued a search warrant at 11:42 p.m. on June 10, 2004. The court found probable cause for the search of Marlatt's residence "and that the public interest requires that this warrant be served at any time." Marlatt had already been detained at a grocery store and taken to the Scottsbluff Police Department, and Cotant served the warrant on her there. Police finally began conducting the search at approximately 3:30 a.m. The search revealed, among other things, a 12 gauge shotgun.

The commander of the Scottsbluff SWAT team testified that his unit was assigned to execute the search warrant. He

explained that his team had approached the house on foot from some distance away and had then attempted to determine where Ramirez was in the house. They were still outside the house when some dogs on the porch began barking, and Ramirez, who was inside the house, began yelling at the dogs to be quiet. The dogs kept barking, and Ramirez came to the front door. The commander challenged Ramirez, identified himself, and ordered Ramirez to show his hands and get down on the ground. Ramirez complied, and police handcuffed him and secured the residence.

### (ii) Postconviction Evidence

Trial counsel testified that he had considered filing a motion to suppress, but decided not to when Ramirez informed him that the search had essentially taken place as described. Counsel said he had been advised by Ramirez that Ramirez had opened the front door when he heard his dogs barking and that when he had seen the police, he had stepped onto the patio and placed his hands behind his back to submit to the SWAT team commander. Counsel had not considered a "knock and announce" issue because Ramirez had opened the door before the police could knock. Counsel also explained that given the facts in the affidavit, he believed the court could have issued an "any time" warrant. Ramirez averred, in an affidavit admitted at the evidentiary hearing, that he had informed counsel that on the night of his arrest, he had been awakened by barking dogs and had actually opened the back door of the home.

### (b) Analysis

For the reasons explained below, we agree with the district court's conclusion that a motion to suppress would have been meritless. Therefore, counsel was not ineffective in not filing such a motion, nor was Ramirez prejudiced by the alleged ineffectiveness.

### (i) Any Time Search

■ Neb. Rev. Stat. § 29-814.04 (Reissue 1995) provides in part that when a court issues a search warrant, "[t]he warrant shall direct that it be served in the daytime unless the magistrate or judge is satisfied that the public interest requires that

it should not be so restricted, in which case the warrant may direct that it may be served at any time." But an affidavit in support of a search warrant need not contain a separate statement of facts showing why the public interest requires that the warrant be served at night, in order for the nighttime search to be valid.[51] Instead, if the affidavit, read in a commonsense manner and as a whole, reasonably supports the inference that the interests of justice are best served by the authorization of nighttime service of a search warrant, provision for such service in the warrant is proper.[52]

Ramirez contends that the affidavit in his case did not set forth a sufficient factual basis for the issuance of an "any time" warrant. We disagree. The affidavit established that Ramirez used methamphetamine, had a shotgun and ammunition, kept the shotgun with him, and had threatened Bates with the shotgun. Thus, the affidavit provided information showing that the execution of the warrant at night, when speed and surprise could be accomplished, would serve to protect the safety of the officers involved. Because the search warrant properly authorized an "any time" search, Ramirez failed to prove counsel was ineffective, or that he was prejudiced, because counsel failed to challenge the warrant.

### (ii) Knock and Announce

 Neb. Rev. Stat. § 29-411 (Reissue 1995) provides that in executing a search or arrest warrant, the executing officer

> may break open any outer or inner door or window of a dwelling house or other building, if, after notice of his office and purpose, he is refused admittance; or without giving notice of his authority and purpose, if the judge or magistrate issuing a search warrant has inserted a direction therein that the officer executing it shall not be required to give such notice . . . . The judge or magistrate may so direct only upon proof under oath, to his satisfaction that the property sought may be easily or quickly destroyed or

---

[51] *State v. Fitch*, 255 Neb. 108, 582 N.W.2d 342 (1998). See, also, *State v. Paul*, 225 Neb. 432, 405 N.W.2d 608 (1987).

[52] *Peters, supra* note 17; *Fitch, supra* note 51; *Paul, supra* note 51.

disposed of, or that danger to the life or limb of the officer or another may result, if such notice be given . . . .

This statute codifies the common-law requirement of knocking and announcing when serving a search warrant prior to breaking into a person's dwelling.[53] And the Fourth Amendment to the U.S. Constitution also requires, absent countervailing circumstances, that officers knock and announce their purpose and be denied admittance prior to breaking into a dwelling.[54]

In this case, the court did not issue a "no knock" warrant pursuant to § 29-411. But the record indicates that Ramirez opened the door, and surrendered to police, before they had an opportunity to knock and announce their presence. Although Ramirez averred that he stepped out the back door, rather than the front door, he does not contest the essential fact that he came out of the house before the police went in. In other words, Ramirez was aware of the presence of the police, and aware of their identity and purpose, before they entered the dwelling. Further identification would have been " 'a useless gesture.' "[55] We agree with the district court that under these circumstances, the knock and announce rule was not violated.[56]

Because Ramirez' trial counsel did not perform deficiently in failing to object to the search of the residence, and Ramirez was not prejudiced, this assignment of error is without merit.

---

[53] *State v. Kelley*, 265 Neb. 563, 658 N.W.2d 279 (2003).

[54] See *id.*, citing *Wilson v. Arkansas*, 514 U.S. 927, 115 S. Ct. 1914, 131 L. Ed. 2d 976 (1995).

[55] See *State v. Pierson*, 238 Neb. 872, 877, 472 N.W.2d 898, 901 (1991).

[56] Compare, e.g., *United States v. Remigio*, 767 F.2d 730 (10th Cir. 1985); *United States v. Lopez*, 475 F.2d 537 (7th Cir. 1973); *Wittner v. United States*, 406 F.2d 1165 (5th Cir. 1969); *United States v. Conti*, 361 F.2d 153 (2d Cir. 1966), *vacated on other grounds* 390 U.S. 204, 88 S. Ct. 899, 19 L. Ed. 2d 1035 (1968); *Belton v. U.S.*, 647 A.2d 66 (D.C. 1994); *State v. Alldredge*, 73 Wash. App. 171, 868 P.2d 183 (1994); *Woodward v. Com.*, 16 Va. App. 672, 432 S.E.2d 510 (1993); *People v Zuccarini*, 172 Mich. App. 11, 431 N.W.2d 446 (1988).

3. Failure to Object to Inadmissible Evidence, Adduce Favorable Evidence, and Impeach Witnesses at Trial

In his remaining three assignments of error, Ramirez raises several arguments with respect to trial counsel's decisions at trial. The district court rejected each of these arguments, either because they were reasonable strategic decisions made my counsel or because Ramirez was not prejudiced by them. Because Ramirez' arguments involve related testimony, it is easiest to consider them together.

### (a) Background

### (i) Trial Evidence

At trial, Bates testified that in May and June 2004, she was living in Marlatt's home near Minatare, Nebraska. At the time, a number of people were staying with Marlatt, including Bates and her daughters, Marlatt's daughters, and Ramirez. Bates testified that sometime during the week of June 7, Ramirez asked Bates to step outside so he could speak to her. Ramirez was upset, and Bates asked Ramirez what his problem was with her. Bates testified that Ramirez reached into his parents' vehicle, parked outside, and pulled out a double-barreled shotgun,

> [a]nd, he pointed it at my face at one point in time of the conversation, and I asked him if he was going to shoot me, and he screamed — he hollered a couple of things at me, me being a stupid bitch. And, then he pointed the gun above my head approximately an inch to two inches above my head and he shot off three rounds.

Bates identified the shotgun seized from the residence as the one Ramirez had brandished. In addition, the police found three expended shotgun shells in the driveway. Later, a witness identified the shotgun as one that he had received as a birthday present in 2003 and had sold to Ramirez in April 2004 for $200.

The amended information charged Ramirez with being in possession of a firearm "on or about the week of June 7, 2004." But Bates testified, without objection, that she had seen Ramirez with the shotgun before the incident and that he "carried it around quite a bit" and "would always have a gun with him." Bates also testified, without objection, that Ramirez often left the gun around the house and "shot the gun off a lot." Bates

was asked if Ramirez had made any other threats with the shotgun, and answered, without objection, that "he stated that if the police were going to come after him, that he wouldn't be taken into custody, he would kill them first."

Bates said that she was high at the time of the incident, and "didn't realize what was going on at the time," but reported the incident to police a couple of days later after she realized that Ramirez was dangerous. Ramirez' trial counsel cross-examined Bates regarding her history of drug use, and particularly her use of methamphetamine at the time of the incident. Counsel also questioned Bates about Ramirez' tone of voice during the incident, and when asked whether Ramirez had "scream[ed]" at Bates, Bates replied without objection, "No, he had the intent to frighten me." Ramirez' counsel responded by asking Bates whether she had studied law and to what extent she had prepared her testimony.

### (ii) Postconviction Evidence

Ramirez' trial counsel was a deputy public defender with the Scotts Bluff County public defender's office, experienced in defending both misdemeanor and felony cases. Before joining the public defender, trial counsel had also been a prosecutor in Scotts Bluff County.

Trial counsel was asked, in his deposition, whether testimony that put Ramirez in possession of a firearm outside the charged timeframe of the week of June 7, 2004, was "something [he] would have wanted to object to." Counsel admitted that he "[i]n retrospect, probably" should have objected. Counsel explained that he did not believe the questions had been particularly objectionable, but "[w]ith 20/20 hindsight, watching the game film, yeah, maybe I'd have done a motion to strike." Counsel was also asked about impeaching Bates on cross-examination and explained that Bates was "crying on the stand, [and] had engendered, in my view, quite a bit of juror sympathy." Counsel explained that he believed Bates' testimony "had had doubt cast upon it significantly" and that he felt an objective fact finder would have found her testimony incredible.

Counsel also was questioned about statements in the affidavit supporting the search warrant, and in Marlatt's pretrial

deposition, indicating that Marlatt had asked Bates to leave the residence on the evening of June 9, 2004. Marlatt testified in her pretrial deposition that "the night [she] went to jail on the warrant," she had "kicked [Bates] out" of the house. Marlatt explained that she had become tired of Bates' being gone and leaving her 2-year-old daughter unattended, claiming to be pregnant, and using drugs and claiming to have had a miscarriage.

Trial counsel explained that he decided "not [to] use . . . Marlatt's testimony during trial concerning any kind of drug use because I believed the results would have been disastrous." Marlatt's deposition had also indicated that she had seen Ramirez with the shotgun and that she was aware of Ramirez' drug use. Marlatt also testified in her deposition that the breaking point with Bates had been that "she was telling me all these lies" including that "he had threatened her life."

(b) Analysis

 Ramirez argues that his trial counsel was deficient in several instances. For the reasons that follow, we conclude that each instance was either reasonable trial strategy by trial counsel or was not prejudicial to Ramirez. An appellate court will not second-guess reasonable strategic decisions by counsel.[57] The entire ineffectiveness analysis is viewed with a strong presumption that counsel's actions were reasonable and that even if they are found unreasonable, the error justifies setting aside the judgment only if there was prejudice.[58]

 Ramirez first complains that trial counsel did not object to Bates' testimony about Ramirez' possession of the shotgun outside the charged timeframe and several other incidental remarks Bates made. We note that where actual or constructive possession of a firearm by a felon is uninterrupted, as the evidence suggests it was here, it constitutes a single offense.[59] But even if some of Bates' testimony was irrelevant, it was not prejudicial. There was no reason for the jury to find Bates' testimony credible on those subjects, but incredible with respect

---

[57] *State v. Brown*, 268 Neb. 943, 689 N.W.2d 347 (2004).

[58] See *State v. McDermott*, 267 Neb. 761, 677 N.W.2d 156 (2004).

[59] See *State v. Williams*, 211 Neb. 650, 319 N.W.2d 748 (1982).

to her testimony about the incident for which Ramirez was convicted. If the jury believed Bates—which it obviously did—then her testimony about that incident alone would leave little alternative but to find Ramirez guilty. In short, Ramirez has not demonstrated a reasonable probability that had counsel objected to Bates' allegedly irrelevant testimony, the result of the proceeding would have been different.[60]

Ramirez argues that trial counsel should have done more to impeach Bates. For example, Ramirez contends that Marlatt could have testified about evicting Bates from her residence, about giving Bates a motive to lie, and about Bates' character for untruthfulness. But adducing that testimony would have opened the door to Marlatt's testimony, suggested in her deposition, that Bates was evicted in part because she reported to Marlatt that Ramirez had threatened Bates' life. Given that, it is evident that counsel made a reasonable strategic decision in not adducing the testimony. Ramirez also argues that Bates should have been cross-examined about alleged inconsistencies between her trial testimony and the police affidavits used to support the search and arrest warrants. Having reviewed the record, we are not convinced that they are as inconsistent as Ramirez asserts, and we conclude that Ramirez was not prejudiced by counsel's failure to use the affidavits on cross-examination.

Ramirez' brief also takes issue with several other alleged failures of trial counsel. We have reviewed the record and find each instance identified by Ramirez to be incidental. In each instance, Ramirez failed to demonstrate a reasonable probability that absent counsel's alleged deficiency, the result of the proceeding would have been different.

In short, Ramirez has failed to demonstrate that any of the alleged deficiencies in trial counsel's performance deprived Ramirez of effective assistance of counsel. We find no merit to Ramirez' remaining assignments of error.

## V. CONCLUSION

For the foregoing reasons, the district court did not err in rejecting Ramirez' claim of ineffective assistance of counsel

---

[60] See *Sims, supra* note 7.

and denying his motion for postconviction relief. The judgment of the district court is affirmed.

AFFIRMED.