Nebraska Supreme Court Online Library
www.nebraska.gov/courts/epub/
02/26/2016 08:20 AM CST

Marilyn Waldron, appellant, v. Lancaster County
Deputy Sheriff James Roark, individually
and in his official capacity, appellee.
___ N.W.2d ___

Filed February 26, 2016.    No. S-15-144.

1. **Summary Judgment: Appeal and Error.** An appellate court will
   affirm a lower court's grant of summary judgment if the pleadings and
   admitted evidence show that there is no genuine issue as to any material
   facts or as to the ultimate inferences that may be drawn from the facts
   and that the moving party is entitled to judgment as a matter of law.
2. ____: ____. In reviewing a summary judgment, an appellate court views
   the evidence in the light most favorable to the party against whom the
   judgment was granted and gives that party the benefit of all reasonable
   inferences deducible from the evidence.
3. **Constitutional Law: Actions.** A civil remedy is provided under 42
   U.S.C. § 1983 (2012) for deprivations of federally protected rights,
   statutory or constitutional, caused by persons acting under color of
   state law.
4. ____: ____. In order to assert a claim under 42 U.S.C. § 1983 (2012),
   the plaintiff must allege that he or she has been deprived of a federal
   constitutional right and that such deprivation was committed by a person
   acting under color of state law.
5. **Constitutional Law: Search and Seizure.** The right to be free from
   unlawful entry of one's residence is a constitutional right of the high-
   est magnitude, and the overriding respect for the sanctity of the home
   has been embedded in the traditions of the United States since the
   nation's origins.
6. **Constitutional Law: Search and Seizure: Warrants: Probable Cause.**
   For Fourth Amendment purposes, an arrest warrant founded on probable
   cause implicitly carries with it the limited authority to enter a dwelling
   in which the suspect lives when there is reason to believe the suspect
   is within.

7. **Warrants.** The manner in which a warrant is executed is subject to later judicial review as to its reasonableness.

8. **Constitutional Law: Search and Seizure.** The common-law knock-and-announce principle forms a part of a Fourth Amendment inquiry into reasonableness.

9. \_\_\_\_: \_\_\_\_. Absent countervailing circumstances, the Fourth Amendment to the U.S. Constitution requires that officers knock and announce their purpose and be denied admittance prior to breaking into a dwelling.

10. \_\_\_\_: \_\_\_\_. The common-law principle of announcement is embedded in Anglo-American law and, therefore, is an element of the reasonableness inquiry under the Fourth Amendment.

11. **Constitutional Law: Search and Seizure: Police Officers and Sheriffs.** Although the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, a court's effort to give content to this term may be guided by the meaning ascribed to it by the framers of the amendment. An examination of the common law of search and seizure leaves no doubt that the reasonableness of a search of a dwelling may depend in part on whether law enforcement officers announced their presence and authority prior to entering.

12. **Police Officers and Sheriffs: Arrests.** It is an affirmative defense to the offense of resisting arrest if the peace officer involved was out of uniform and did not identify himself or herself as a peace officer by showing his or her credentials to the person whose arrest is attempted.

13. **Police Officers and Sheriffs: Warrants.** It is not necessary for police officers to knock and announce their presence when executing a warrant when circumstances present a threat of physical violence, or if there is reason to believe that evidence would likely be destroyed if advance notice were given, or if knocking and announcing would be futile.

14. **Search and Seizure.** In determining whether an individual search or seizure is reasonable, courts evaluate the totality of the circumstances.

15. **Police Officers and Sheriffs: Warrantless Searches.** Exigency determinations are generally fact intensive.

16. **Warrantless Searches.** In a criminal case, the factual determination whether exigent circumstances existed to excuse a warrantless arrest is a question for the court; when the issue arises in a civil damage suit, it is properly submitted to the jury providing, given the evidence on the matter, there is room for a difference of opinion.

17. \_\_\_\_. In the context of a civil suit, whether exigent circumstances existed is guided by examination of the exigent circumstances exception in criminal cases.

18. **Constitutional Law: Search and Seizure: Police Officers and Sheriffs.** A claim that law enforcement officers used excessive force to

effect a seizure is governed by the Fourth Amendment's "reasonableness" standard.

19. ____: ____: ____. Determinations of the reasonableness of a particular use of force under the Fourth Amendment involves careful attention to the facts and circumstances of each particular case.

20. ____: ____: ____. In determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment, a court must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interest alleged to justify the intrusion.

21. **Police Officers and Sheriffs: Arrests: Words and Phrases.** "Reasonable force" which may be used by an officer making an arrest is generally considered to be that which an ordinarily prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would deem necessary under the circumstances.

22. **Police Officers and Sheriffs: Arrests.** The inquiry into the reasonableness of a use of force assesses reasonableness at the moment of the use of force, as judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.

23. **Search and Seizure: Police Officers and Sheriffs.** An illegal search does not justify the use of force in resisting an officer.

24. **Summary Judgment.** On a motion for summary judgment, the question is not how the factual issues are to be decided but whether any real issue of material fact exists.

Appeal from the District Court for Lancaster County: Robert R. Otte, Judge. Reversed and remanded for further proceedings.

Vincent M. Powers, of Vincent M. Powers & Associates, for appellant.

Richard C. Grabow and David A. Derbin, Deputy Lancaster County Attorneys, for appellee.

Wright, Connolly, Cassel, and Stacy, JJ.

Wright, J.

## NATURE OF CASE

This action was brought pursuant to 42 U.S.C. § 1983 (2012). Appellant, Marilyn Waldron, filed an appeal from the

district court's order granting summary judgment to appellee, Lancaster County Deputy Sheriff James Roark. Waldron was a 78-year-old woman who sustained injuries when Roark and his partner, Deputy Sheriff Amanda May, entered Waldron's home to serve an arrest warrant on her grandson, Steven Copple. The officers were not uniformed and drove an unmarked vehicle.

Waldron claimed the deputies did not display badges and did not present a warrant upon demand before or after using force to enter her home. She claimed that Roark forcefully placed her in handcuffs, which caused injuries, including a torn rotator cuff. Waldron claimed that the entry was in violation of the Fourth Amendment and that Roark used excessive force. The district court found that as a matter of law, the deputies' entry was proper, that Waldron obstructed the work of the deputies, and that Roark's use of force was objectively reasonable.

For the reasons stated below, we reverse the order of the district court granting summary judgment and remand the cause for further proceedings.

BACKGROUND

The parties' characterizations of the facts of this case differ substantially, but in reviewing orders granting summary judgment, we consider the facts in the light most favorable to the nonmoving party.[1] Consequently, the following facts are set forth in a light most favorable to Waldron:

On the evening of February 22, 2012, Roark and May went to Waldron's home to serve an arrest warrant on Copple for failure to appear at sentencing for a misdemeanor charge of disturbing the peace. Copple had prior police contacts, which included at least one weapons charge. Additionally, there was at least some indication that Copple may have had a desire for a "suicide by cop." The severity of the prior weapons charge and the context of the information concerning

---

[1] *Melanie M. v. Winterer*, 290 Neb. 764, 862 N.W.2d 76 (2015).

Copple's possible desire for a "suicide by cop" are unclear from the record.

Copple lived with Waldron at all relevant times. Waldron's husband, now deceased, was a retired captain with the Nebraska State Patrol and had instructed her to never allow a person claiming to be law enforcement into the home without a badge or a warrant. Roark and May were both dressed in plain clothes at the time. Roark was dressed in jeans, a sweatshirt, and a ball cap. May wore jeans and a nonuniform shirt. Neither deputy had a badge displayed. The deputies drove an unmarked vehicle.

Upon arriving at Waldron's home, Roark observed Copple's vehicle near the house. As Roark approached the home, he observed a young male he identified as Copple inside the house and proceeded to the front door. May went to the rear of the house to ensure Copple did not flee out the back door. Roark rang the doorbell. Waldron went to the door and began opening it cautiously. As Waldron began to open the door, Roark forced the door open and pushed his way past Waldron. When he entered the home, Roark stated that he was a deputy sheriff and demanded to know where Copple was located. Waldron demanded to see a warrant. Roark ignored Waldron's requests and did not present a warrant or display his badge.

Once inside the house, believing Copple had fled toward the basement, Roark and May drew their service weapons and ran toward the basement stairs. Roark encountered a young male, later identified as a friend of Copple who was visiting him, sitting in the basement. Roark testified that the individual was very cooperative and provided Roark information regarding Copple's whereabouts. May ordered Waldron to stay in the kitchen and not follow Roark to the basement. Despite this instruction and May's attempts to block Waldron from doing so, Waldron proceeded to the basement, following Roark. Waldron continued to yell at the officers and threatened to call the police on Roark and May, who had not shown identification as police officers.

Once Waldron was in the basement, Roark threw Waldron to the ground, breaking her glasses. Once on the ground, Roark placed his knee into Waldron's back and pulled her right arm back, causing her substantial pain. Waldron resisted Roark's attempts to place her in handcuffs by keeping her arm stiff. She told Roark that she had surgery on her right shoulder and did not want to be placed in handcuffs because of the pain it caused. After being restrained, Waldron slipped one of her hands out of the handcuffs due to the pain. Roark again placed Waldron in handcuffs, and at some point, she fell onto a couch and then to the floor. Waldron continued to resist being placed in handcuffs by keeping her arms stiff. Waldron sustained bruises to her hands and legs and experienced a great deal of pain in her shoulders. Waldron testified that during this time, the deputies had still not displayed either a badge or a warrant.

Uniformed Lincoln Police Department officers arrived to assist, and Copple was subsequently located in the house and arrested. Waldron admitted to one of the uniformed officers that she had not been compliant with Roark and May because she "'did not know who they were.'" One of the officers asked Roark whether he had a copy of the warrant, to which Roark responded that he did not have the warrant but that he knew one existed. Waldron was then transported to the Lancaster County jail, where she was lodged after being charged with obstructing government operations and resisting arrest. The resisting arrest charge was later amended to false reporting. Waldron successfully completed a pretrial diversion program, and the charges were dismissed without prejudice. Waldron has no additional criminal history or arrests.

On September 18, 2013, Waldron filed this action pursuant to 42 U.S.C. § 1983 against Roark in his individual and official capacities. She claimed that Roark's actions violated her civil rights under the 4th and 14th Amendments. Waldron claimed that Roark's actions constituted an unlawful entry into her home. Moreover, Waldron claimed Roark used excessive force

to restrain her. Waldron alleged that she sustained physical injuries to her neck, back, and shoulders, requiring treatment, including a torn left rotator cuff.

Roark denied the allegations in the complaint. He asserted the affirmative defense of qualified immunity and argued that Waldron's claims were barred by her participation in pretrial diversion for the offenses of false reporting and obstructing government operations.

On February 13, 2015, the district court granted summary judgment to Roark. The court stated that it was viewing the record and "drawing all reasonable inferences in the light most favorable to [Waldron], while simultaneously viewing the facts from the perspective of a reasonable law enforcement officer on the scene." In considering Waldron's Fourth Amendment argument, the court cited *Payton v. New York*,[2] stating, "When the police enter the home of the person they wish to arrest, the arrest warrant suffices for entry if 'there is reason to believe the suspect is within.'" The court noted that Roark had a warrant for Copple's arrest and observed Copple inside the house as he approached and that, therefore, he had reason to believe Copple was in the home despite Waldron's statements to the contrary.

The district court found that Roark possessed an arrest warrant for Copple, observed Copple in the window, and saw Copple go to the basement. It found that the exigent circumstances doctrine applied, because once Copple was aware of the deputies' presence, Roark had a realistic expectation that any delay in entry might result in Copple's arming himself, becoming a threat, destroying evidence, or simply escaping. Thus, even absent a warrant, the court found the circumstances justified the deputies' entry.

In considering the issue of whether Roark used excessive force, the district court concluded as a matter of law that

---

[2] *Payton v. New York*, 445 U.S. 573, 603, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980).

Roark's use of force was objectively reasonable. It found that the undisputed facts showed Waldron was uncooperative by impeding Roark's entrance, failing to obey directives, following deputies to the basement, and physically resisting being handcuffed. The court also noted that an unknown third party (Copple's friend) was present and that the deputies knew Copple had prior contact with law enforcement that included weapons offenses.

The district court did not address the issue of whether Roark was entitled to qualified immunity or whether Waldron's claims were barred by her participation in pretrial diversion.

## ASSIGNMENT OF ERROR

Waldron assigns that the district court erred in granting summary judgment in favor of Roark.

## STANDARD OF REVIEW

[1,2] An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.[3] In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence.[4]

## ANALYSIS

Viewing the evidence in a light most favorable to Waldron, we must determine if there is a material issue of fact whether Roark's entry into Waldron's home violated her Fourth Amendment right to be free from unreasonable searches and seizures and whether the district court erred in finding,

---

[3] *Melanie M. v. Winterer, supra* note 1.

[4] *Id.*

as a matter of law, that Roark's use of force was objectively reasonable.

[3,4] A civil remedy is provided under 42 U.S.C. § 1983 for deprivations of federally protected rights, statutory or constitutional, caused by persons acting under color of state law.[5] In order to assert a claim under § 1983, the plaintiff must allege that he or she has been deprived of a federal constitutional right and that such deprivation was committed by a person acting under color of state law.[6] Here, Waldron alleged that her Fourth Amendment rights were violated by Roark's unlawful entry into her home. Furthermore, she alleged that Roark, while acting under color of state law, violated her 4th and 14th Amendment rights to be free from excessive force. She alleged Roark was acting in the scope and course of his employment as a deputy with the Lancaster County Sheriff's Department.

The question is whether the facts viewed most favorably to Waldron create an issue of fact whether Roark's conduct in serving the misdemeanor arrest warrant was objectively reasonable. In granting summary judgment in favor of Roark, the court found that Roark's entry into Waldron's home was proper pursuant to the arrest warrant for Copple and, even absent the warrant, was justified by the exigent circumstances exception to the warrant requirement. Furthermore, the district court found that as a matter of law, Roark's use of force to arrest Waldron was objectively reasonable.

ROARK'S ENTRY INTO HOME

We first consider if there was a question of fact whether Roark's entry into Waldron's home violated her rights under the Fourth Amendment.

[5-7] The U.S. Supreme Court has noted that the right to be free from unlawful entry of one's residence is a constitutional

---

[5] *Amanda C. v. Case*, 275 Neb. 757, 749 N.W.2d 429 (2008).

[6] See *id.*

right of the highest magnitude and that "the overriding respect for the sanctity of the home . . . has been embedded in our traditions since the origins of the Republic."[7] For Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.[8] However, the manner in which a warrant is executed is subject to later judicial review as to its reasonableness.[9]

The district court concluded that Roark's entry was justified because he had a valid arrest warrant for Copple and reason to believe he resided at Waldron's home. Waldron does not contest the validity of the arrest warrant for failure to appear for sentencing on a misdemeanor disturbing the peace conviction. Nor does she argue that the deputies lacked reason to believe Copple resided at Waldron's home and was present there on the date and time in question. In general, Roark was authorized to enter Waldron's home under the U.S. Supreme Court's holding in *Payton v. New York*[10] for the purpose of effecting the arrest of Copple. But this does not end the analysis. While an officer may be permitted to enter the home under the rule in *Payton*, the Fourth Amendment is also concerned with the manner of the entry. Officers are required to take additional steps before entering the home for the purpose of executing a warrant.

The execution of arrest warrants in Nebraska is governed by Neb. Rev. Stat. § 29-411 (Reissue 2008), which in relevant part provides:

> In executing a warrant for the arrest of a person charged with an offense, or a search warrant, or when authorized

---

[7] *Payton v. New York, supra* note 2, 445 U.S. at 601.

[8] *Payton v. New York, supra* note 2.

[9] *Dalia v. United States*, 441 U.S. 238, 99 S. Ct. 1682, 60 L. Ed. 2d 177 (1979).

[10] *Payton v. New York, supra* note 2.

to make an arrest for a felony without a warrant, the officer may break open any outer or inner door or window of a dwelling house or other building, *if, after notice of his office and purpose, he is refused admittance . . . .*
(Emphasis supplied.)

[8,9] This statute codifies the common-law requirement of knocking and announcing when serving an arrest warrant prior to breaking into a person's dwelling.[11] This requirement recognizes the deep privacy and personal integrity interests people have in their home. We have held that the common-law knock-and-announce principle forms a part of a Fourth Amendment inquiry into reasonableness.[12] An officer's unannounced entry into a home might, in some circumstances, be unreasonable under the Fourth Amendment.[13] Absent countervailing circumstances, the Fourth Amendment to the U.S. Constitution requires that officers knock and announce their purpose and be denied admittance prior to breaking into a dwelling.[14] This would apply equally to the execution of an arrest warrant.

[10,11] The U.S. Supreme Court, in *Wilson v. Arkansas*,[15] has similarly held that the common-law principle of announcement is embedded in Anglo-American law and, therefore, is an element of the reasonableness inquiry under the Fourth Amendment. The Court held that the manner of an officer's entry into a dwelling to execute a warrant was among the factors to be considered in assessing the reasonableness of a search or seizure, stating:

"Although the underlying command of the Fourth Amendment is always that searches and seizures be

---

[11] *State v. Ramirez*, 274 Neb. 873, 745 N.W.2d 214 (2008).

[12] *State v. Kelley*, 265 Neb. 563, 658 N.W.2d 279 (2003).

[13] *Id.*

[14] *State v. Ramirez, supra* note 11.

[15] *Wilson v. Arkansas*, 514 U.S. 927, 115 S. Ct. 1914, 131 L. Ed. 2d 976 (1995).

reasonable," . . . our effort to give content to this term may be guided by the meaning ascribed to it by the Framers of the Amendment. An examination of the common law of search and seizure leaves no doubt that the reasonableness of a search of a dwelling may depend in part on whether law enforcement officers announced their presence and authority prior to entering.[16]

Years later, in *Hudson v. Michigan*,[17] the Court further articulated the practicalities for requiring officials to knock and announce their presence. There, the Court noted:

> One of those interests is the protection of human life and limb, because an unannounced entry may provoke violence in supposed self-defense by the surprised resident. . . . Another interest is the protection of property. . . . The knock-and-announce rule gives individuals "the opportunity to comply with the law and to avoid the destruction of property occasioned by a forcible entry." . . . And thirdly, the knock-and-announce rule protects those elements of privacy and dignity that can be destroyed by a sudden entrance. It gives residents the "opportunity to prepare themselves for" the entry of the police.[18]

Thus, the knock-and-announce requirement serves to protect the safety of police officers by preventing the occupant from taking defensive measures against a perceived unlawful intruder.[19] Moreover, it protects occupants of the home from similarly being harmed by officers who react to measures of self-defense against perceived intruders. This practical consideration is particularly acute in the case at bar, because

---

[16] *Id.*, 514 U.S. at 931 (citation omitted).

[17] *Hudson v. Michigan*, 547 U.S. 586, 126 S. Ct. 2159, 165 L. Ed. 2d 56 (2006).

[18] *Id.*, 547 U.S. at 594 (quoting *Richards v. Wisconsin*, 520 U.S. 385, 117 S. Ct. 1416, 137 L. Ed. 2d 615 (1997)) (citations omitted).

[19] *U.S. v. Sargent*, 319 F.3d 4 (1st Cir. 2003).

Roark and May were not in uniform, did not display badges or the warrant, demanded entry into Waldron's home, and displayed weapons.

Viewing the facts in the light most favorable to Waldron, we consider if there was a question of fact whether Roark provided proper notice of his office or purpose and displayed his badge or the warrant. The question is whether Roark complied with the knock-and-announce requirement of the Fourth Amendment and § 29-411. Roark and May drove an unmarked vehicle to Waldron's home. They were not in uniform, and Waldron testified that they failed to display anything that identified them as law enforcement officials. She testified that upon the doorbell ringing, she opened the door cautiously and Roark immediately began to force his way into her home. After forcing his way into the home, Roark stated that he was a sheriff's deputy and demanded to know where Copple was located. Roark drew his service weapon and began searching the home. At no point before or after their entry did they produce a copy of the warrant or show their badges as Waldron demanded.

Roark argues that his statement identifying himself as a sheriff's deputy was sufficient to announce his office and purpose. But given the facts of this case when considered most favorably to Waldron, we disagree. Roark was dressed in jeans, a sweatshirt, and a ball cap and did not show his badge. Instead, he displayed a weapon upon entry into Waldron's home. Although a misdemeanor warrant existed for Copple, Roark failed to produce a copy of the warrant before or after his forced entry into the home.

[12] Waldron could have reasonably believed that Roark was an unknown male forcing his way into her home claiming to be a law enforcement officer. And without some official display of authority, a jury could find that Roark did not properly announce his entry. Indeed, the Legislature has recognized that it is an affirmative defense to the offense of resisting arrest if the peace officer involved was out of

uniform and did not identify himself or herself as a peace
officer by showing his or her credentials to the person whose
arrest is attempted.[20]

The district court, citing to *Payton v. New York*,[21] correctly
concluded that when the police enter the home of the person
they wish to arrest, the arrest warrant suffices for entry if
there is reason to believe the subject of the warrant is within.
But it incorrectly suggested that *Payton* created a blanket
rule allowing police to force entry into homes to serve war-
rants immediately, thus bypassing the common-law knock-
and-announce requirement. The Court's subsequent holdings,
as well as § 29-411, make clear that the manner of serving
the warrant is relevant to the determination of reasonableness
under the Fourth Amendment.

Roark cites to the Eighth Circuit's holding in *U.S. v.
Mendoza*,[22] wherein the court concluded that once a door is
opened, the knock-and-announce rule is vitiated. In *Mendoza*,
the court found that officials did not violate the knock-and-
announce rule when they entered a dwelling without a door.
The court concluded that knocking on an open or missing
door was futile. But *Mendoza* examined whether officials
were required to "knock" on an open or nonexistent door.
Here, there was clearly a door and no doubt that Roark
"knocked" (rang the doorbell) and that Waldron answered
the door. Moreover, whereas the officers in *Mendoza* were
dressed in "raid gear" (vests and jackets with the word
"Police" conspicuously displayed),[23] Roark was not in uni-
form and did not display a badge or warrant, and he imme-
diately forced his way into the home as Waldron opened the
door. Regardless of the "knocking" portion of the rule, the

---

[20] Neb. Rev. Stat. § 28-904 (Reissue 2008); *State v. Daniels*, 220 Neb. 480, 370 N.W.2d 179 (1985).

[21] *Payton v. New York, supra* note 2.

[22] *U.S. v. Mendoza*, 281 F.3d 712 (8th Cir. 2002).

[23] *Id.* at 714.

facts construed most favorably to Waldron establish a material issue of fact whether Roark "announced" his office in a proper manner. Roark misconstrues *Mendoza* to suggest that once a door is open, an officer can enter in any manner he or she desires. We find that there was a question of fact as to whether Roark properly displayed notice of his office or authority.

### Exigent Circumstances

[13] Roark's failure to knock and announce his office and purpose may have been reasonable if exigent circumstances existed at the time of his entry. The U.S. Supreme Court has held that it is not necessary for police officers to knock and announce their presence when executing a warrant when circumstances present a threat of physical violence, or if there is reason to believe that evidence would likely be destroyed if advance notice were given, or if knocking and announcing would be futile.[24] If circumstances support a reasonable suspicion of exigency when the officers arrive at the door, they may go straight in.[25] Police must have a reasonable suspicion under the particular circumstances that one of the grounds for failing to knock and announce their presence before executing a warrant exists, and this showing is not high.[26] We examine this issue next.

[14-16] In determining whether an individual search or seizure is reasonable, courts evaluate the "totality of [the] circumstances."[27] Exigency determinations are generally fact intensive.[28] The Sixth Circuit has held:

---

[24] *Hudson v. Michigan, supra* note 17.

[25] *United States v. Banks*, 540 U.S. 31, 124 S. Ct. 521, 157 L. Ed. 2d 343 (2003).

[26] *Hudson v. Michigan, supra* note 17.

[27] *Missouri v. McNeely*, ___ U.S. ___, 133 S. Ct. 1552, 1559, 185 L. Ed. 2d 696 (2013).

[28] See *State v. Eberly*, 271 Neb. 893, 716 N.W.2d 671 (2006).

"Although, in a motion to suppress evidence in a criminal case, the factual determination whether exigent circumstances 6 a warrantless arrest is a question for the court, *when the issue arises in a civil damage suit it is properly submitted to the jury providing, given the evidence on the matter, there is room for a difference of opinion.*"[29]

[17] In the context of a civil suit, whether exigent circumstances existed is guided by examination of the exigent circumstances exception in criminal cases. Several commonly recognized categories include: (1) "hot pursuit" of a fleeing felon; (2) threatened destruction of evidence inside a residence before a warrant can be obtained; (3) a risk that the suspect may escape from the residence undetected; or (4) a threat, posed by a suspect, to the lives or safety of the public, the police officers, or to an occupant.[30]

The district court determined that the undisputed facts showed that exigent circumstances existed to permit the deputies' entry even had no warrant existed. The court found that the deputies had a realistic expectation that any delay in their entry might result in Copple's arming himself, becoming a threat, destroying evidence, or simply escaping. But the officers were at Waldron's home to arrest Copple for failure to appear at sentencing for a misdemeanor disturbing the peace charge. Consequently, the officers could not have been concerned with destruction of evidence. Nor were they in hot pursuit of Copple. May was watching the back door of the home to prevent Copple from fleeing undetected. The only possible exigency would have been that Copple posed a threat to the safety of the deputies or the public.

---

[29] *Carlson v. Fewins*, 801 F.3d 668, 676 (6th Cir. 2015) (emphasis in original).

[30] *State v. Eberly, supra* note 28.

The Eighth Circuit's decision in *U.S. v. Lucht*[31] provides us guidance on this issue. There, the Eighth Circuit determined that failure to observe the knock-and-announce requirement required that evidence be suppressed. The officer assumed a particular situation was high risk because the Emergency Response Unit (ERU), a tactical police unit, was tasked with executing the search warrant. In that case, the officer leading the ERU into the home knew the occupant was a suspected member of the Hell's Angels with antipolice sentiments and likely had access to weapons in the home. The trial court found that exigent circumstances existed so as to render the knock-and-announce requirement a useless gesture. The Eighth Circuit reversed, stating:

> We appreciate the fact that [the officer] assumed this was a high risk situation because ERU was employed. However, a decision to force entry cannot rest on an assumption. It requires consideration of the particular facts and circumstances surrounding the execution of the warrant. Here, ERU was not in a dangerous tactical situation. They did not hear or see anything to indicate they were in danger or that evidence was being destroyed. [The officer] knew that there was a likelihood that there were weapons in the house, but he had no information indicating that [the suspect] was considered dangerous or violent or might be inclined to use the weapons against them. [The officer's] belief that [the suspect] had a propensity for anti-police sentiments was not based on any particularized knowledge.[32]

Given the Eighth Circuit's reasoning in *Lucht*, we find there was a material issue of fact whether exigent circumstances existed in attempting to arrest Copple.

---

[31] *U.S. v. Lucht*, 18 F.3d 541 (8th Cir. 1994).

[32] *Id.* at 551 (citation omitted).

Excessive Force

We next consider Waldron's claim that Roark used excessive force to arrest her.

[18-20] The district court concluded as a matter of law that Roark's use of force was objectively reasonable. We consider whether there was a material issue of fact whether Roark's use of force was reasonable. A claim that law enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's "reasonableness" standard.[33] Determinations of the reasonableness of a particular use of force under the Fourth Amendment involves "careful attention to the facts and circumstances of each particular case."[34] In determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment, we must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.[35]

[21,22] "Reasonable force" which may be used by an officer making an arrest is generally considered to be that which an ordinarily prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would deem necessary under the circumstances.[36] The inquiry assesses reasonableness at the moment of the use of force, as judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.[37] This allows for the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and

---

[33] *Plumhoff v. Rickard*, ___ U.S. ___, 134 S. Ct. 2012, 188 L. Ed. 2d 1056 (2014).

[34] *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).

[35] *Tolan v. Cotton*, ___ U.S. ___, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014).

[36] *State v. Lingle*, 209 Neb. 492, 308 N.W.2d 531 (1981).

[37] *Graham v. Connor, supra* note 34.

rapidly evolving—about the amount of force that is necessary in a particular situation."[38] Some relevant but nonexhaustive factors considered by courts in determining the reasonableness of force include "'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'"[39]

The district court concluded that the undisputed facts showed that Waldron was uncooperative with Roark and May. The court noted that Waldron disregarded directives given to her, fought being restrained, and even slipped out of the handcuffs placed on her. The court stated, "This was all being done at a time where the officers were in pursuit of Copple, an unknown third party had made an appearance, and the officers knew that Copple had previous law enforcement contacts including weapons offenses." The court concluded that Waldron's actions diverted the deputies' attentions, which increased the risk to the deputies. The district court further suggested, if not concluded, that Roark had probable cause to arrest Waldron for obstruction of government operations and resisting arrest.

While a jury may accept Roark's testimony over Waldron's or make factual findings identical to the district court, we are obliged to view the facts most favorably to Waldron and give her all reasonable inferences of those facts. Accepting Waldron's testimony, at the time she was being "uncooperative," was failing to "comply with directives," and "fought being restrained," unknown persons had forced their way into her home and displayed weapons. The undisputed facts show that neither Roark nor May was in uniform. According to Waldron, as she opened the door to her home, Roark began forcing his way into the home and did not display a badge or

---

[38] *Smith v. City of Minneapolis*, 754 F.3d 541, 546 (8th Cir. 2014).

[39] *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009) (quoting *Graham v. Connor, supra* note 34).

warrant upon demand. Under such circumstances, a reasonable homeowner might understandably be uncooperative and resist being restrained. Given Waldron was married to a law enforcement official for nearly 50 years, a jury might infer that she would have been cooperative had she known Roark was a sheriff's deputy.

Roark argues that he had the authority to restrain Waldron and place her under arrest for multiple misdemeanors. Under Neb. Rev. Stat. § 29-404.02(1)(b) (Reissue 2008), a peace officer may arrest a person without a warrant if the officer has reasonable cause to believe that such person has committed a misdemeanor in the presence of the officer. Among the misdemeanors alleged were violations of Neb. Rev. Stat. § 28-907(1) (Reissue 2008) and Lincoln Mun. Code § 9.08.040 (2016) (intentionally false reporting by stating that Copple was not home), Neb. Rev. Stat. § 28-901 (Reissue 2008) (obstructing government operations), and § 28-904 (resisting arrest). The district court supported this view, stating, "[Waldron] knew, at some point, that Deputy Roark and Deputy May were there to arrest her grandson. She knew they were officers of the law and she knew she was obstructing the execution of the warrant."

[23] It is true that under no circumstances should a person resist arrest by officers, regardless of the lawfulness of the arrest. This court has held that an illegal search does not justify the use of force in resisting an officer.[40] The Legislature has codified this rule.[41] But this rule applies *when the actor knows* that he or she is being arrested by a peace officer. Presumably, a person knows he or she is being arrested once law enforcement identification or other conspicuous indicators of official status are displayed. It is an affirmative defense to prosecution for resisting arrest if the peace officer involved is out of uniform and did not identify himself or herself as a peace officer

---

[40] *State v. Wells*, 290 Neb. 186, 859 N.W.2d 316 (2015).

[41] See Neb. Rev. Stat. § 28-1409(2) (Reissue 2008).

by showing his or her credentials to the person whose arrest is attempted.[42]

Given the facts viewed most favorably to Waldron, we question how she would know "at some point" that Roark and May were sheriff's deputies if they were not in uniform and did not display their badges or the arrest warrant. Once *uniformed* officers arrived on the scene, there is no evidence suggesting that Waldron continued to be uncooperative. Roark testified that Waldron, while demanding he and May leave her home immediately, yelled that she was going to call the police.

The district court did not find that Waldron was physically threatening or interfering with the deputies, but only that she was yelling at them and at Copple. The court instead found that she presented a danger to the deputies by distracting their attention. She yelled at Roark and May and demanded that they show either a badge or warrant, or leave her home. The Eighth Circuit has held, "'[T]he use of any force by officers simply because a suspect is argumentative, contentious, or vituperative' is not to be condoned."[43] Force can be used only to overcome physical resistance or threatened force.[44] May stated that they "just put [Waldron] into custody to keep her safe and . . . away from any problem."

Both the district court and Roark also discuss the presence at the scene of the arrest of a young adult male, who was later determined to be Copple's friend, as a justification for Roark's actions. But there is no indication whatsoever that this individual was uncooperative or threatening or otherwise presented a danger to the deputies. The record suggests the opposite is true. Waldron and Roark each testified that the individual was cooperating with the deputies by giving

---

[42] § 28-904; *State v. Daniels, supra* note 20.

[43] *Bauer v. Norris*, 713 F.2d 408, 412 (8th Cir. 1983) (quoting *Agee v. Hickman*, 490 F.2d 210 (8th Cir. 1974)).

[44] *Id.*

them information concerning Copple's whereabouts. Roark testified that he had asked the individual to show his hands to determine he was not a threat and that he was "cooperating the whole time," remaining seated with his hands visible, and providing the deputies with information as to Copple's whereabouts. Regardless, it is unclear how any lack of cooperation by Copple's friend would justify the use of force against Waldron.

At the time of the incident, Waldron was 78 years old, was approximately 5 feet 1 inch tall, and weighed approximately 145 pounds. She had recently had surgery on her shoulder and had limited mobility of her arm. She had previously suffered a stroke. Waldron alleged Roark threw her to the ground, causing Waldron to break her glasses and bruise her face, hands, and legs. He pressed his knee into her back, pulling her arms forcefully behind her as he did so. Waldron informed Roark of her recent shoulder surgery and the pain his actions were causing to her shoulder. Once Waldron slipped out of the handcuffs due to the pain, Roark again pulled her arms behind her back and placed her in the handcuffs.

Waldron testified that once uniformed officers arrived on the scene, one officer removed the handcuffs. When Roark observed her without handcuffs, he insisted that she be placed in handcuffs again, despite her cooperation at that point and the presence of uniformed officers on the scene who had found and arrested Copple. Another officer on the scene requested that Roark cuff her in the front rather than forcing her arms behind her back due to Waldron's pain. Waldron alleged that as a result of Roark's use of force, she sustained considerable bruising to her legs and hands. She claimed she suffered a full thickness tear of the rotator cuff in her shoulder. She received treatment for pain in her neck, back, and shoulders. A medical report indicates she experiences constant pain in her shoulder.

[24] On a motion for summary judgment, the question is not how the factual issues are to be decided but whether any

real issue of material fact exists.[45] Considering the totality of the circumstances and accepting the facts in the light most favorable to Waldron and granting her all reasonable inferences therefrom, there is a material question of fact whether Roark's entry into her home was unreasonable and whether the force he used was excessive.

## CONCLUSION

For the reasons stated above, we reverse the order of the district court granting summary judgment in favor of Roark and remand the cause for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.

HEAVICAN, C.J., and MILLER-LERMAN, J., participating on briefs.

MCCORMACK, J., not participating.

---

[45] *Gonzalez v. Union Pacific RR. Co., ante* p. 281, 872 N.W.2d 579 (2015).