IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. WASHBURN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

HEIDI R. WASHBURN, APPELLANT.

Filed April 21, 2020.    No. A-19-647.

Appeal from the District Court for Lancaster County: JOHN A. COLBORN, Judge, on appeal thereto from the County Court for Lancaster County: LAURIE J. YARDLEY, Judge. Judgment of District Court affirmed.

Matt Catlett, of Law Office of Matt Catlett, for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

PIRTLE, BISHOP, and ARTERBURN, Judges.

ARTERBURN, Judge.

## I. INTRODUCTION

Heidi R. Washburn appeals from her conviction for obstructing a police officer following a jury trial in the county court for Lancaster County. She first appealed to the district court, which affirmed her conviction. Based on the reasons that follow, we also affirm.

## II. BACKGROUND

On March 5, 2018, the State filed a complaint in the county court for Lancaster County against Washburn, alleging that, by using or threatening to use violence, force, physical interference, or obstacles, she intentionally obstructed, impaired, or hindered law enforcement or the preservation of the peace by a peace officer contrary to Neb. Rev. Stat. § 28-906 (Reissue 2016). Washburn entered a not guilty plea to the charge on the same date. On May 25, 2018,

- 1 -

Washburn filed a motion to suppress all evidence obtained by law enforcement as the result of its warrantless entry into her home at 1736 Washington Street, No. 1, in Lincoln.

A hearing on Washburn's motion to suppress took place on July 16, 2018. Lincoln Police Officer Jason Drager testified that he responded to a call at 1709 Washington Street at approximately 6 p.m. on March 3, 2018. On the porch or in the driveway of a residence across the street at 1736 Washington Street, Drager observed a man who he knew to have an outstanding warrant. He recognized the man as Thomas Martin. While Martin was initially outside smoking a cigarette, Drager noticed him go in and out of the residence approximately three or four times during the course of responding to the call across the street. Another officer, Aaron Bergren, arrived to assist Drager at at his location, and Drager informed him of Martin's presence across the street at 1736 Washington Street.

Drager and Bergren finished with the original call and proceeded to verify Martin's outstanding warrants through their database accessed via their police cruiser computer. They observed an active bench warrant dated February 2, 2018, which listed Martin's address as "1736 Washington #1" and a second active bench warrant dated March 1, 2018, which listed Martin's address as "1736 Washington St." Drager testified that the address on the warrants indicated that Martin had been previously arrested and told police officers that was the address at which he lived.

Drager acknowledged that he did not attempt to verify that Martin lived at the address noted on the warrants by checking the mailbox, Register of Deeds, lease agreement, or vehicle registration. Drager testified that he had seen Martin outside the residence multiple times throughout the year prior to March 3, 2018, when he was on patrol in the area.

Drager testified that Bergren and he approached the home at 1736 Washington Street approximately 1 to 2 minutes after last seeing Martin enter the home. They knocked on the door, which was answered by Washburn. According to Drager, Washburn "essentially told [them] to hold on" when they asked for Martin, and went back into the home. She returned after approximately five minutes and said that Martin was getting dressed and would then be out to see them. Drager stated that he did not see Martin inside the apartment when they were at the door speaking with Washburn. Drager also stated that the entirety of the apartment was not clearly visible from the doorway.

When the officers told Washburn that they were there to arrest Martin on an outstanding warrant, she became "confrontational," told them that Martin was not there, and that they had no right to be there either. Drager testified that Washburn attempted to close the door after the officers explained that they were allowed to be there in order to arrest Martin, but Bergren used his body to block the door from closing. Washburn eventually released the door and backtracked inside the home while yelling at the officers. Drager said that Bergren decided to place Washburn under arrest, which she resisted, and Drager then assisted Bergren in placing her in handcuffs. The officers found Martin in a laundry area that was shared with other apartments and placed him under arrest. Drager testified that while they were at the jail, Martin identified Washburn as his wife. Washburn, however, told Drager at one point that Martin did not reside at that residence.

Washburn testified that she lived in apartment No. 1 at 1736 Washington Street in Lincoln on March 3, 2018. She described her residence as a portion of a former single-family home, which

was converted into three apartments. Washburn said that the front door to her apartment was the home's original front door before it was converted into apartments.

Washburn testified that knocking woke her up from a nap, and when she opened her door, an officer first said they were there looking for "John" before correcting himself and saying "Tom." She said that she told the officers, "Nobody is in here." She also testified that she knows a Tom and that a Tom has visited her home but that no Tom has ever resided there. She added that no Tom appears on her lease or mailbox. She acknowledged that the officers at some point said that Tom's last name was Martin and conceded that she knew a Tom Martin. Washburn said that she closed the door and looked around her apartment because people come and go and could have entered the apartment while she was taking a nap without her knowing. However, she also testified that it was not possible for a Tom Martin to have been inside her apartment at that time.

Washburn said that she was never shown a copy of an arrest warrant or search warrant. She did acknowledge, however, that one of the police officers said, "Well, we have a warrant" and that another officer said, "We have a warrant for Tom."

Washburn said that after she told officers that there was no Tom in her apartment, one of them replied, "We have reason to believe that he is there," which she said led to her getting "in a fight" with the officers. She said that an officer "shoved the door very violently out of [her] hands and bashed it against [her] interior wall." Washburn said that an officer threw her against her furniture and then began going through her personal belongings and throwing her laundry around. She testified that she was placed in handcuffs and left standing in her apartment while the officers exited.

Washburn testified that she never told the officers that Martin was inside her apartment, that she would go get him, or that he was putting on clothing. She acknowledged during cross-examination that she contradicted herself during direct examination, first saying that the officers never mentioned a warrant and later saying that an officer did mention having a warrant. On redirect examination, Washburn contradicted herself again, saying that no officer ever told her that they had a warrant.

The court, ruling from the bench, overruled Washburn's motion to suppress. The court found that Drager had observed Martin, with whom he was familiar from previous contacts, go in and out of the apartment at 1736 Washington Street at least three times. Drager reviewed Martin's warrants, which listed Martin's address as 1736 Washington Street. Accordingly, the court found that it was reasonable for Drager to believe that Martin lived at that residence and was inside it when he knocked on Washburn's door.

On November 5, 2018, the case came on for jury trial. During the State's opening statement, Washburn objected to any reference made to anything that occurred after she was placed in custody. She argued that the State mentioning anything after she closed the door was irrelevant and being stated for the purpose of painting her as having made a false statement to a police officer. The court overruled Washburn's objection.

At trial, Drager testified in conformity with his testimony at the suppression hearing. He said that a Lincoln Police Department recruit and he responded to a call for service at 1709 Washington Street around 6 p.m. on March 3, 2018. He stated that, while responding to that call he observed Martin, who he knew had an active warrant for his arrest, go in and out of the residence

across the street at 1736 Washington Street. He estimated that there were 30 or 40 feet between the two locations. Using his in-cruiser computer system, Drager confirmed that Martin had two active arrest warrants. One warrant identified Martin as living at "1736 Washington St" while the other listed his address as "1736 Washington #1." Drager testified that officers commonly ask for a current address whenever they are in contact with someone and that the addresses are loaded into their database. "[W]hatever address they have listed in there is because they told an officer at some point that was their address." Drager testified that he was familiar with Martin and knew that he had an active warrant through either contacting him or seeing his picture somewhere. He also testified that he had seen Martin a few days prior at the same residence.

Drager finished responding to the initial call and informed another officer who was present, Bergren, about Martin being across the street and having an active warrant for his arrest. Drager testified that after he moved his police cruiser closer to the residence, his recruit and he approached the front door of 1736 Washington Street while Bergren approached the rear door. Shortly after their initial approach, another officer arrived and went to the rear door while Bergren joined Drager at the front door.

Drager testified that he was in uniform with his badge displayed when he knocked on the front door, which Washburn answered. He asked to speak with Martin, and Washburn said that he was inside and she would get him. After a few moments, Washburn returned and said that Martin was changing his clothes or putting on clothes and would be out in a few minutes. Drager told Washburn that they were there to arrest Martin, and Washburn then said that Martin did not live there and was not inside. She attempted to close the door on Drager and Bergren, but Bergren placed his foot in the door to keep her from shutting it. Drager acknowledged that he did not have a copy of Martin's arrest warrants in hand when he went to Washburn's door.

Washburn "became argumentative," and Drager said that Bergren "tried to essentially negotiate with her" because they knew that Martin was inside and were there to execute a warrant for his arrest. Drager testified that Washburn kept trying to close the front door despite Bergren's foot being in the way. He said that they told Washburn that they were allowed to go inside to arrest Martin because they knew that it was his address and that he was inside. They also advised Washburn that she could be cited for obstruction if she continued blocking their access. They then "forced" their way into the residence and began to place Washburn under arrest for obstructing a police officer. She struggled and pulled her arms away, so the officers placed her in handcuffs. Another officer took Washburn outside while Drager and Bergren swept through the rest of the house to look for Martin.

When the State began to elicit testimony from Drager regarding what happened after Washburn was handcuffed, Washburn objected on the basis that that evidence did not go to the obstruction charge. Washburn argued that it was instead intended to cause the jury to believe that she was hiding a fugitive and aiding and abetting some type of conduct by Martin. The court overruled Washburn's objection.

Drager testified that they located Martin in 1736 Washington Street. He said that from Washburn's kitchen, there is a door that leads to a small common room, which had three other doors: one to a backyard parking and garage area, one to another apartment, and one to a laundry room. He said that there was an officer standing watch outside the door that led from the small

room into the backyard parking and garage area. Drager stated that they found Martin in the laundry room.

Bergren, who had not been called to testify at the suppression hearing, testified at trial. Bergren testified that while they responded to a call across the street, Drager pointed out a person sitting on the porch of 1736 Washington Street who Drager recognized had an active warrant for his arrest. Bergren said that they looked up Martin in their local records management system and confirmed that he had an outstanding warrant. Bergren said that he reviewed the photo in their system from a prior jail booking and confirmed that it was the same person who was sitting on the porch across the street.

Bergren said that he approached the building identified as Martin's residence from the rear to ensure that no one left through that door. He shortly thereafter joined Drager at the front of the residence while another officer covered the back door, ensuring that it was constantly observed. Bergren said that he heard a confrontation between Washburn and Drager, so he began speaking with Washburn to explain that they knew Martin was in the home and that there was an active warrant for his arrest, which they intended to execute. He acknowledged that he was not holding onto a copy of the warrant and did not present a copy to Washburn during their interaction. He also acknowledged that Washburn said that Martin did not live there. Bergren said that Washburn refused them entry into her home, and he placed his foot in the way of the door when Washburn attempted to close it.

At trial, Washburn objected to Bergren testifying about what happened after she attempted to close the door on the officers. The court overruled that objection and recognized Washburn's standing objection to the same. Bergren described that Washburn began going back into the home and that Drager and he followed her in and placed her in handcuffs. Bergren and Drager then "cleared the residence looking for [Martin]" while another officer took Washburn into custody.

Bergren testified that they found Martin in the residence's basement. He said that the basement was accessed by exiting Washburn's residence and entering a small common space that had three other doors, which led to the backyard area, another apartment, and the basement. Bergren said that as they proceeded throughout the residence, he made continuous announcements that he was a police officer and was there to arrest Martin on a warrant. Bergren testified that as they made their way toward the basement, Martin "announced from the basement that he was down there and that he would come upstairs." Bergren confirmed Martin's identity.

Washburn testified at trial and confirmed that she lived at 1736 Washington Street on March 3, 2018. She said that she lived in apartment No. 1 of a three-unit complex. She said that she was asleep when officers knocked on her door, which she believed occurred around 4 p.m., not 6 p.m., as they had testified. Washburn initially said that she opened the door and began speaking with two officers. She said that Bergren told her that they were there looking for "John" before Drager corrected him and said they were looking for "Tom Martin." She later testified that she closed the door after the officers announced they were with the Lincoln Police Department because of her sleeping attire and told them she needed to get dressed. She said that she put on clothes and opened the door again, and the officers then told her why they were there. Washburn testified that there was a woman jumping up and down on the sidewalk in front of her residence,

saying "'They're here. They're here. They're here for drugs. They think you have drugs in your house.'"

Washburn said that she told the officers, "'There is no Tom Martin that lives here. And you'll find that, you know, this is my apartment.'" Washburn said that the officers never mentioned the existence of a warrant for Martin. According to Washburn, Bergren "was starting to get frustrated and angry" at that point and told her that they wanted inside her apartment to see if Martin was present because he was "'wanted.'" She testified that she replied that Martin was not there, that they could not come inside, and that she was going to shut the door and go back to bed. Washburn said that Bergren placed his foot in the door so that it would not close and then "took his hand, his arm, and pushed the door, I mean, very roughly." She said that Bergren placed his foot in the door once she had already started closing the door. Washburn said that Bergren then proceeded through her residence to the back and returned and put handcuffs on her. According to Washburn, Drager said that Martin was not in there.

Washburn testified that Martin did not live in her residence on March 3, 2018. She said that the door from her apartment that led into the common area from which the laundry room could be accessed was locked and that a large exterior storage bench was placed in front of it. Washburn said that the storage bench was filled with concrete masonry materials, garden equipment, shovels, and other yard tools. Washburn testified that it would be false if any police officer testified that they had gone out through that door from her apartment into the common space through which the basement laundry room was accessible.

Washburn testified that she believed she was alone when she was awoken by police officers knocking on her door on March 3, 2018. She also testified that Martin never lived at her home, but she acknowledged that she knew him and that he had been inside her home at other times. She said that Martin had been in her home as recently as the week prior to March 3, 2018. On cross-examination, however, Washburn testified that she never told the officers that Martin was in her residence.

On November 6, 2018, the jury found Washburn guilty of obstructing a police officer. Also on November 6, Washburn filed a motion for a new trial. A hearing was held on November 30 at which the court overruled the motion. At the same hearing, Washburn proposed that she be sentenced to a $50 fine. The court fined Washburn $100 and ordered her to pay the court costs.

Washburn appealed her conviction and sentence to the district court, which entered an order affirming the county court on June 3, 2019. The district court found that the county court correctly denied Washburn's motion to suppress because the police officers entered her home pursuant to a valid arrest warrant for Martin and had probable cause to believe he was inside. Accordingly, the district court concluded that no violation of Washburn's Fourth Amendment rights occurred. Next, the district court concluded that there was sufficient evidence to support Washburn's conviction for obstructing a police officer because her attempts to shut her front door on the officers constituted an affirmative physical act, which interfered with the officers' attempts to arrest Martin. The district court also found that the county court's decision to reject Washburn's first, second, third, and fifth proposed jury instructions was proper. It determined that the first, second, and third instructions were correct statements of law but were not warranted by the evidence in Washburn's case. The fifth proposed instruction, the court found, was subsumed

within the fourth instruction, which the county court accepted and issued to the jury. Thus, the district court found that the county court was correct in rejecting a duplicative jury instruction. Finally, the district court found that the county court did not abuse its discretion in permitting evidence of events that occurred after the officers arrested Washburn because the evidence's probative value was high and the danger of unfair prejudice was low. Accordingly, the district court affirmed Washburn's conviction.

Washburn now appeals the decision of the district court.

### III. ASSIGNMENTS OF ERROR

On appeal, Washburn assigns that the district court erred in affirming the county court's order denying her motion to suppress, in finding there was sufficient evidence to sustain her conviction, in finding the county court did not err in denying certain jury instructions, and in finding the county court did not err in permitting evidence of events that occurred after police officers entered Washburn's residence.

### IV. STANDARD OF REVIEW

In an appeal of a criminal case from the county court, the district court acts as an intermediate court of appeals, and its review is limited to an examination of the record for error or abuse of discretion. *State v. Todd*, 296 Neb. 424, 894 N.W.2d 255 (2017). Both the district court and a higher appellate court generally review appeals from the county court for error appearing on the record. *Id*. When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id*. Appellate courts independently review questions of law in appeals from the county court. *Id*. When deciding appeals from criminal convictions in county court, appellate courts apply the same standards of review that they apply to decide appeals from criminal convictions in district court. *State v. Avey*, 288 Neb. 233, 846 N.W.2d 662 (2014).

In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. *State v. Kruse*, 303 Neb. 799, 931 N.W.2d 148 (2019). Regarding historical facts, an appellate court reviews the trial court's findings for clear error. *Id*. But whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. *State v. Kruse, supra*.

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Garcia*, 302 Neb. 406, 923 N.W.2d 725 (2019). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*.

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make discretion a

factor in determining admissibility. *State v. Smith*, 292 Neb. 434, 873 N.W.2d 169 (2016). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *State v. Smith, supra*.

Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision. *State v. Case*, 304 Neb. 829, 937 N.W.2d 216 (2020).

## V. ANALYSIS

### 1. MOTION TO SUPPRESS

Washburn argues that the observation by police officers of her closing her front door and all evidence derived therefrom and thereafter ought to have been suppressed because the officers violated her protections under the Fourth Amendment. The State argues in reply that no Fourth Amendment violation occurred and, thus, the lower court properly denied Washburn's motion to suppress. Based on our review, we conclude that the district court did not err by affirming the county court's denial of Washburn's motion to suppress.

The exclusionary rule, or suppression, bars the prosecution from introducing evidence obtained in violation of the Fourth Amendment. *Davis v. United States*, 564 U.S. 229, 131 S. Ct. 2419, 180 L. Ed. 2d 285 (2011). The rationale underlying this exclusionary rule was first articulated by the Court in *Weeks v. United States*, 232 U.S. 383, 393, 34 S. Ct. 341, 58 L. Ed. 652 (1914):

> If letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the 4th Amendment, declaring his right to be secure against such searches and seizures, is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution.

Accordingly, the U.S. Supreme Court held that evidence obtained during an unconstitutional search or seizure cannot be used as proof against the subject of an unconstitutional search or seizure. *Id*. Thus, suppression necessarily requires that there first be a violation of the Fourth Amendment's guarantees.

The Fourth Amendment to the U.S. Constitution and the parallel provision of the Nebraska Constitution protect people against unreasonable searches and seizures of their homes. U.S. Const. amend. IV; Neb. Const. art. I, sec. 7. The Nebraska Supreme Court has consistently held that the entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant. *State v. Bray*, 297 Neb. 916, 902 N.W.2d 98 (2017). A police officer who has obtained neither an arrest warrant nor a search warrant cannot make a nonconsensual and warrantless entry into a suspect's home in the absence of exigent circumstances. *Id*.

For Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within. *Waldron v. Roark*, 292 Neb. 889, 874 N.W.2d 850 (2016). However, the manner in which a warrant is executed is subject to later judicial review as to its reasonableness. *Id*.

The execution of arrest warrants in Nebraska is governed by Neb. Rev. Stat. § 29-411 (Reissue 2016), which in relevant part provides:

In executing a warrant for the arrest of a person charged with an offense, or a search warrant, or when authorized make an arrest for a felony without a warrant, the officer may break open any outer or inner door or window of a dwelling house or other building, if, after notice of his office and purpose, he is refused admittance.

This statute codifies the common-law requirement of knocking and announcing when serving an arrest warrant prior to breaking into a person's dwelling. *Waldron v. Roark, supra*. This requirement recognizes the deep privacy and personal integrity interests people have in their home. *Id*. Our Supreme Court has held that the common-law knock-and-announce principle forms a part of a Fourth Amendment inquiry into reasonableness. *Waldron v. Roark, supra*. Absent countervailing circumstances, the Fourth Amendment to the U.S. Constitution requires that officers knock and announce their purpose and be denied admittance prior to breaking into a dwelling. *Waldron v. Roark, supra*. This would apply equally to the execution of an arrest warrant. *Id*.

Our Supreme Court in *Waldron v. Roark*, *supra*, determined that a question of fact was generated with respect to whether an officer's "announcement" prior to entering a private home to execute a search warrant satisfied the knock-and-announce principle or was reasonable under the Fourth Amendment. In that case, an officer rang the doorbell, and a person from inside the home opened the door. However, the officer who was dressed in plain clothes and not displaying a badge, immediately forced his way into the home once the door was "cautiously" opened, and only stated that he was a sheriff's deputy after he was already in the home.

In the present case, Drager and Bergren acted very differently from the officer in *Waldron v. Roark*, *supra*. They observed Martin outside the front of Washburn's residence and saw him go into and come out of the residence. They knew that Martin had an active arrest warrant. They verified the existence of an arrest warrant via their police cruiser computer system, which revealed two active warrants for Martin's arrest, both of which listed 1736 Washington Street as his address. Drager testified that the addresses on Martin's warrants were generated by Martin having told an officer that was his home address during a prior encounter.

Drager testified that he knocked on Washburn's front door while wearing his police uniform and displaying his badge. He said that Washburn answered the door and then went back inside after he announced that he was looking for Martin. Drager said that Washburn returned and said that Martin was putting on clothes and would then come to the door, but Washburn testified that she did not say that. Drager stated that he then told Washburn that he was there to arrest Martin pursuant to an active warrant. Washburn first testified that no officer ever mentioned the existence of a warrant; then she reversed and said they mentioned a warrant but did not present the warrant to her; and then Washburn reversed herself again during her testimony at the suppression hearing and said that the officers did not reference an active warrant. The county court apparently found the testimony of Drager to be more credible than that adduced from Washburn. In a review of the correctness of a trial court's ruling on a suppression motion, an appellate court will accept the factual determinations and credibility choices made by the trial court unless, in light of all the

circumstances, such findings are clearly erroneous. *State v. DeGroat*, 244 Neb. 764, 508 N.W.2d 861 (1993); *State v. Howell*, 26 Neb. App. 842, 924 N.W.2d 349 (2019).

Under the precedent as illustrated by *Waldron v. Roark*, 292 Neb. 889, 874 N.W.2d 850 (2016), the Fourth Amendment granted Drager and Bergren the limited authority to enter Washburn's residence to arrest Martin because that address was listed as his residence on two arrest warrants, and they had reason to believe that he was inside based on their observations of him entering the residence. Additionally, Drager and Bergren executed the arrest warrant in a reasonable manner. The evidence indicates that they knocked on Washburn's door and announced themselves and their purpose while wearing uniforms and displaying their badges. When Washburn did not comply with admitting the officers into her residence, they forced their way inside, placed her in handcuffs, and proceeded through her home until they found Martin in the shared basement laundry room. Their execution of the warrant for Martin's arrest was unlike the officer's execution of an arrest warrant in *Waldron v. Roark, supra*. Pursuant to our standard of review, we conclude that the officers executed the warrant for Martin's arrest reasonably and that no violation of Washburn's Fourth Amendment protections occurred. Accordingly, because there was no Fourth Amendment violation, suppression of any evidence was not warranted. The district court did not err in affirming the county court's denial of Washburn's motion to suppress.

### 2. SUFFICIENCY OF EVIDENCE

Washburn argues that there was insufficient evidence to sustain her conviction for obstructing a police officer. She alleges that she did nothing more than exercise a constitutional right. The State argues in response that there was sufficient evidence to sustain Washburn's conviction. We find that there was sufficient evidence to support the jury's finding of guilt.

Under § 28-906(1),

[a] person commits the offense of obstructing a peace officer, when, by using or threatening to use violence, force, physical interference, or obstacle, he or she intentionally obstructs, impairs, or hinders (a) the enforcement of the penal law or the preservation of the peace by a peace officer or judge acting under color of his or her official authority or (b) a police animal assisting a peace officer acting pursuant to the peace officer's official authority.

There must be some sort of affirmative physical act, or threat thereof, for a violation of § 28-906 to occur. *State v. Ellingson*, 13 Neb. App. 931, 703 N.W.2d 273 (2005).

The evidence against Washburn, taken in the light most favorable to the State, includes testimony that she attempted to close her front door while Bergren's foot was in its path. As we discussed above, Drager and Bergren were at Washburn's residence to arrest Martin pursuant to active warrants for his arrest. Those warrants listed 1736 Washington Street as his address, and they had observed him enter that residence. Thus, when Washburn affirmatively acted by attempting to close the door on Bergren while his foot was in the way, she used force and introduced an obstacle to impair and hinder the officers' attempt to locate and arrest Martin. We conclude that, taking the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Thus, the county

court did not err in accepting the jury's guilty verdict, which verdict was based on sufficient evidence.

### 3. JURY INSTRUCTIONS

Washburn contends that the county court erred in refusing four of her proposed jury instructions, which she alleges were correct statements of law, were warranted by the evidence, and that their exclusion prejudiced her. In reply, the State argues that the county court properly denied the jury instructions in question. Upon our de novo review of this issue, we agree with the district court and conclude that the county court did not err in excluding four of Washburn's proposed jury instructions.

To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Case*, 304 Neb. 829, 937 N.W.2d 216 (2020).

Washburn's first proposed jury instruction states, "Closing the door of one's residence in response to a police officer's request to enter the residence is not itself evidence of a crime." In support of the instruction, she cites two cases, *United States v. Prescott*, 581 F.2d 1343 (9th Cir. 1978) and *New Jersey v. Berlow*, 284 N.J. Super. 356, 665 A.2d 404 (1995). Although this instruction may be a correct statement of law, the particular evidence of this case does not warrant the instruction. In both of the two cases cited by Washburn, the law enforcement officers who sought to enter private residences to search for a wanted person did so without the benefit of either a search warrant or arrest warrant. The evidence in this case showed that officers were at Washburn's residence to lawfully execute a warrant for the arrest of a person known to be in her residence and communicated that information to Washburn. They were not present merely to request entry into Washburn's residence. Moreover, Washburn did not simply close her door. She, instead, used her door as an obstacle to prevent Drager and Bergren from enforcing the law--thus, making her conduct evidence of the crime of obstructing a police officer. Accordingly, the court did not err in excluding Washburn's first proposed jury instruction.

Washburn's second proposed jury instruction states, "When a peace officer demands entry into a residence but presents no warrant, there is a presumption that the officer has no right to enter and an occupant may act on that presumption and refuse admission." Washburn's third proposed jury instruction states, "You may consider the absence of a warrant when considering whether the defendant had the requisite intent to commit the offense of obstructing a peace officer." In support of these instructions, she cites *Camara v. Municipal Court*, 387 U.S. 523, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967). Notably, *Camara* concerned a warrantless inspection of an apartment by city housing inspectors. The Court held that a citizen could refuse entry to the inspectors who did not have an inspection warrant based on probable cause. The Court did not require that the inspector present a copy of the warrant to the citizen. Therefore, to the degree that the proposed instructions imply that the officers herein needed to produce a copy of the arrest warrant, it exceeds the scope of the holding in *Camara.* Our Supreme Court precedent is clear that an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the

suspect lives when there is reason to believe the suspect is within. We discern no requirement in *Waldron v. Roark*, 292 Neb. 889, 874 N.W.2d 850 (2016), or elsewhere that requires the physical production of an arrest warrant. Moreover, in this case, the officers were wearing uniforms and badges. They knocked and announced their presence and explained to Washburn that they were there to arrest Martin pursuant to arrest warrants that had been previously issued. As a result, even if we found proposed instructions two and three to be correct statements of the law, they would not be warranted by the evidence. Accordingly, the court did not err in excluding Washburn's second proposed jury instruction.

Washburn's fourth proposed jury instruction states, "In order to obstruct a peace officer, there must be some sort of affirmative physical act, or threat thereof, for a violation of this section to occur." Her fifth proposed jury instruction states, "Mere refusal to consent to a peace officer's entry into one's residence is not obstructing a police officer." While both instructions are correct statements of law and warranted by the evidence in this matter, they essentially state the same proposition. The court gave Washburn's fourth proposed instruction but excluded the fifth. We further note that Instruction No. 3 given by the court accurately recited the elements of the offense of obstructing a peace officer. That instruction similarly required the jury to find that Washburn employed violence, force, physical interference, or obstacle to intentionally obstruct, impair, or hinder the enforcement of the law or preservation of the peace by a law enforcement officer. Because the instructions are duplicative, we find no prejudice in the court's exclusion of Washburn's fifth proposed jury instruction. Accordingly, we affirm the district court's decision which found no error in the county court's decision to exclude four of Washburn's five proposed jury instructions.

### 4. EVIDENCE OF LATER EVENTS

Washburn argues that the court erred in permitting the State to adduce evidence of events that occurred after the officers entered her residence. The State argues in reply that the evidence was properly admitted. We agree with the district court that there was no abuse of discretion by the county court in admitting this evidence and, thus, affirm.

All relevant evidence is admissible except as otherwise provided by the U.S. Constitution or the State of Nebraska, by Act of Congress or of the Legislature of the State of Nebraska, by these rules, or by other rules adopted by the Supreme Court of Nebraska which are not in conflict with laws governing such matters. Neb. Rev. Stat. § 27-402 (Reissue 2016). Evidence that is not relevant is not admissible. *Id*. Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Neb. Rev. Stat. § 27-401 (Reissue 2016); *State v. Munoz*, 303 Neb. 69, 927 N.W.2d 25 (2019).

Although relevant, evidence *may* be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. See Neb. Rev. Stat. § 27-403 (Reissue 2016).

Washburn argues that the admission of evidence from the time period after she was handcuffed was intended by the State to show that she was dishonest and was harboring a fugitive.

The evidence she argues ought to have been excluded includes the officers' testimony that they found Martin in the common basement laundry room, which they accessed by proceeding through a door at the back of Washburn's residence. The complained of evidence is both relevant and highly probative. The jury was tasked with the decision of whether to credit the testimony of Drager and Bergren, or to credit the testimony of Washburn. The evidence of Martin being found in a common area of Washburn's residence has significant probative value because, as the State argues, it supports the officers' testimony that they had seen Martin enter into the residence and had reason to believe that he would be located inside. This evidence diminished Washburn's credibility given her testimony that Martin had not been in her residence for approximately a week. Accordingly, we find no abuse of discretion by the county court in allowing the State to adduce evidence of events that occurred after Washburn was handcuffed because the evidence was relevant and its probative value was not substantially outweighed by the danger of unfair prejudice.

## VI. CONCLUSION

For the reasons stated above, we affirm the decision of the district court which affirmed Washburn's conviction for obstructing a police officer.

AFFIRMED.